

FILED

Oct 10 2023, 8:46 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Jeffrey C. Gerish
Plunkett Cooney
Bloomfield Hills, Michigan

Crystal G. Rowe
New Albany, Indiana

ATTORNEYS FOR APPELLEE

Philip A. Whistler
Jenny R. Buchheit
Eric J. McKeown
Ice Miller LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

London Witte Group, LLC,

*Appellant-Defendant,*

v.

City of Marion,

*Appellee-Plaintiff.*

October 10, 2023

Court of Appeals Case No.
22A-MI-2060

Appeal from the Grant Superior
Court

The Honorable David A. Happe,
Special Judge

Trial Court Cause No.
27D03-1612-MI-168

**Opinion by Judge Bradford**
Judges Riley and Weissmann concur.

**Bradford, Judge.**

# Case Summary

London Witte Group, LLC ("LWG") and the City of Marion ("the City") have been engaged in litigation relating to the financing of a construction project in downtown Marion since September 29, 2017. The matter came before this court and the Indiana Supreme Court in 2020 and 2021, respectively. In the instant appeal, which follows a jury trial, LWG contends that the trial court abused its discretion in denying its motions for a directed verdict and its subsequent motion to correct error. LWG alternatively contends that the jury's verdict is excessive. For its part, the City contends that the trial court acted within its discretion in denying LWG's motions and that the jury's verdict is supported by the evidence. We affirm.

# Facts and Procedural History[1]

As is stated above, this matter has previously come before both this Court and the Indiana Supreme Court. Our opinion issued in the prior appeal sets forth the facts relating to the parties' underlying dispute as follows:

> A few years before 2008 or 2009, the YMCA in Marion moved into a new space, leaving the old YMCA building in downtown Marion vacant. In 2008 or 2009, the City began discussions with Michael An, a developer from California. An proposed a redevelopment of the old YMCA building into a combination of hotel, restaurant, retail, and commercial spaces [("the YMCA

---

[1] We held oral argument in this case on September 20, 2023, in our courtroom in the Indiana Statehouse. We commend counsel for the quality of their written submissions and oral presentations.

project")].  He estimated that the project would cost around $5.5 million.  The City was willing to provide bond financing in the amount of $2.5 million, meaning that An had to come up with $3 million from other sources.

The core of the City's project team was Mayor Wayne Se[y]bold, Director of Development Darren Reese, Bruce Donaldson of Barnes and Thornburg, and Bob Swintz of LWG.  Reese was the point person on the project.  Donaldson, who served as bond counsel, reported to Reese.  Swintz served as financial advisor.  The bonds would be funded from a tax-increment financing (TIF) district, with Swintz's role being to determine "how much room is in the TIF district to do this project."  Appellant's App. Vol. II p. 197.[ ]  Essentially, Swintz's primary job was to ensure that the City could pay back the bonds.

First Farmers Bank … emerged as the prospective bond buyer.  The Bank and the City each expected that An would provide proof that he had attained the additional $3 million in financing.  In December 2009, shortly before the bond issue, Swintz told the Bank that he had spoken with Reese and Mayor Seybold and that the City had "the comfort they need[ed] for the YMCA project."  Appellant's App. Vol. III p. 231.  Reese and Donaldson were included on the email and Reese later said that he had no reason to dispute Swintz's statement.  A few days later, the Bank again questioned whether An had the full funding in hand in correspondence to Reese and Donaldson, reminding them that the Bank "need[ed] to insure that there [were] sufficient funds to complete the project at all times."  *Id*. at 234.  Swintz responded to the Bank, explaining that "[a]s far as the City is concerned the developer had provided written documentation about the funding to complete the project."  *Id*. at 237.  Swintz later testified that he "would not have come up with [his response] without talking to" Reese, Mayor Seybold, or Donaldson.  Appellant's App. Vol II. p. 239–40.

Meanwhile, on December 4, 2009, An, through Chad Seybold, provided a memorandum of understanding [("the Cho

Memorandum")] to Swintz. The [Cho Memorandum] was non-binding and signed by Se Kwon Cho; it stated that Cho would make $3 million available to An to complete the project. The [Cho Memorandum] also indicated that it was not a final, legally binding agreement, though both An and Cho signed it. Chad indicated to Swintz that the [Cho Memorandum] was the proof requested by the City and the Bank that An had the $3 million in financing on hand. Years later, at the time of the litigation at issue herein, neither Mayor Seybold nor Reese recalled knowing about the [Cho Memorandum]. The City claims that Swintz intentionally withheld the [Cho Memorandum] from the Bank and the City.

Evidently, Swintz's assurances satisfied the Bank, because the bonds were issued on December 16, 2009. At some point, construction began, but it was never completed. The City refinanced the bonds in 2011, after which An continued to work on the project and to look for investors.

In December 2013, four years after the bond issue, the Marion Chronicle-Tribune published several critical articles about the project and submitted several information requests. In response, the City hired KPMG to perform a forensic audit of the project; KMPG found no improprieties, though Chad failed to comply with KPMG's document requests. The State Board of Accounts … also reviewed the project and found, in the spring of 2014, that it was nearly completed.

In December 2015, An died. The project remained unfinished. The City filed a complaint against An's estate on December 8, 2016. The City entered into a tolling agreement with LWG on February 13, 2017, which tolled the statute of limitations through September 30, 2017. On September 29, 2017, the City filed an amended complaint, adding Chad and LWG as defendants. The primary allegation from which the City's claims against LWG stems is that LWG "not only failed to tell the City that An lacked the money to complete the project, it prevented the Bank from learning it—a fact which would have stopped, or at least

substantially changed, the bond issue." Appellant's Br. p. 8. The specific claims remaining against LWG are for negligence, breach of fiduciary duty, and constructive fraud/unjust enrichment.

During the discovery process, the City allegedly first became aware of the [Cho Memorandum]. Additionally, discovery has revealed that bond proceeds were used to provide personal benefits to Mayor Seybold, including payment of the premium on a life insurance policy, cash payments to Mayor Seybold's wife, and contributions to Mayor Seybold's political campaigns. Moreover, An was allegedly told that the City would invest in his project only if he hired the Mayor's brother, Chad.

On May 17, 2019, LWG filed a motion for summary judgment on each of the three claims against it. LWG's motion focused on the statute of limitations for each claim, arguing that the complaint was filed outside the limitations period. During the oral argument on the summary judgment motion, counsel for the City conceded that "in the spring of 2014, the City ... certainly had some concerns about the misapplication of bond proceeds." Tr. Vol. II p. 36.

On July 8, 2019, the trial court entered an order granting LWG's motion with respect to the claims for negligence and breach of fiduciary duty and denying it with respect to the claim for constructive fraud/unjust enrichment. In pertinent part, the trial court found as follows:

> The negligence and breach of fiduciary duty Counts are based on the two-year statute of limitations contained in Ind. Code § 34-11-2-4(a). The two-year period had expired long before February 16, 2017 when LWG signed a tolling agreement with the City.
>
> LWG's work for the City as it relates to this case was divided into two parts:

• The December 1, 2009 Series 2009 Bonds for a principal amount of $2,500,000; and

• The February 15, 2011 Refinancing of the 2009 Bonds and consolidation of obligations from other City projects.

LWG's work on the 2009 Bonds and its work on the 2011 Refinancing are intertwined. At the latest the City became aware that bond funds may have been misappropriated in the Spring of 2014. As a result the City's Corporate Counsel employed a forensic accounting firm to investigate and the City requested an investigation by the State Board of Accounts. The Court determines that at the latest the statute of limitations ... began to run as of the Spring of 2014.

The Court finds that the City may not rely upon the continuous representation nor the adverse domination nor fraudulent concealment ... to extend the begin date for the two-year statute of limitations....

* * *

The Court denies the relief requested in the [summary judgment motion] as to the constructive fraud/unjust enrichment claim. That claim is based on the six-year statute of limitations contained in I.C. § 34-11-2-7(4) and did not begin to run until LWG's work on the 2011 Refinancing was completed.

Appealed Order p. 1–2. The trial court deemed the grant of summary judgment on the first two counts to be a final and appealable judgment; it later certified the denial of summary judgment on the third count for interlocutory appeal.

*City of Marion v. London Witte Grp., LLC*, 147 N.E.3d 362, 365–67 (Ind. Ct. App. 2020) (cleaned up, bracketed information added) ("*City of Marion I*"), *trans. granted*.

[3] On appeal, we concluded that the City's negligence and breach of contract claims were barred by the applicable two-year statute of limitations, stating as follows:

> the undisputed evidence in the record shows that the City had enough information long before February 2015 to have caused it to inquire further regarding possible wrongdoing. And, in fact, it did inquire further by instituting investigations from KPMG and the State Board of Accounts. Therefore, we find that the discovery rule bars these two claims against LWG.

*Id.* at 370–71. We further concluded that neither the continuous-representation doctrine, the doctrine of fraudulent concealment, nor the adverse-domination doctrine applied to toll the statute of limitations period. *Id.* at 371–73. We also concluded that the trial court had erred in applying a six-year statute of limitation to the City's constructive fraud/unjust enrichment count, concluding that a two-year statute of limitations governed the claim. *Id.* at 374. As such, we affirmed the portion of trial court's order relating to the negligence and breach-of-contract claims, reversed the portion relating to the constructive-fraud/unjust-enrichment count, and "remanded with instructions to enter summary judgment in LWG's favor on the City's claim for constructive fraud/unjust enrichment." *Id.*

[4] The City sought transfer, which the Indiana Supreme Court granted, vacating our prior opinion. *See City of Marion v. London Witte Grp., LLC*, 169 N.E.3d 382 (Ind. 2021) ("*City of Marion II*"). The Indiana Supreme Court adopted the doctrine of adverse domination as a potential avenue for tolling a statute of limitation in Indiana, finding that "the doctrine, which has been significantly developed over time in other jurisdictions, is a logical corollary of our discovery rule." *Id.* at 390. The Supreme Court limited the doctrine's application to situations where "intentional wrongdoing of some kind" is involved. *Id.* at 392. Applying the doctrine to the facts at hand, the Supreme Court held that

> the City sufficiently established facts to avoid the statute of limitations defense on summary judgment. Drawing all reasonable inferences in favor of the City, there are genuine issues of material fact as to whether knowledge of the injury was available to the City while Mayor Seybold was in office. Moreover, there are genuine issues of material fact as to whether [LWG] was complicit in Mayor Seybold's wrongdoing. Summary judgment "should not be granted when it is necessary to weigh the evidence." *Bochnowski v. Peoples Fed. Sav. & Loan Ass'n*, 571 N.E.2d 282, 285 (Ind. 1991). After weighing the evidence, a factfinder ultimately may not conclude that the City proved Mayor Seybold's adverse domination and [LWG]'s complicity, but that is a matter for trial, not summary judgment.

*Id.* at 395. Finding that "[s]ummary judgment on all counts [was] inappropriate as the City established facts in avoidance of the statute of limitations defense at this stage," the Supreme Court remanded the matter to the trial court for further proceedings. *Id.* at 397.

On remand, the case proceeded to trial. At the conclusion of the City's case-in-chief, LWG moved for directed verdict on the issues of whether (1) the adverse-domination doctrine applied and (2) the City had presented sufficient evidence to support its negligence, fiduciary duty, and damages claims. The trial court denied LWG's motions for directed verdict "but in the interest of the jury's time, reserved the Court's explanation of the ruling to be made by" a written order, which was issued on May 23, 2022. Appellant's App. Vol. II p. 73. The trial continued, after which the jury returned a general verdict for the City, in which it found the City's total damages were $3,285,920.00 and that LWG was 95% responsible for the City's damages. Based on its findings relating to damages and fault, the jury entered a verdict against LWG in the amount of $3,121,624.00. LWG filed a motion to correct error, which was denied by the trial court on August 1, 2022.

## Discussion and Decision

At the conclusion of the City's case-in-chief, LWG filed two motions for a directed verdict. LWG challenges the trial court's denial of both motions on appeal, which follows the denial of LWG's motion to correct error.

### I. Standard of Review

"The standard of review on a challenge to a directed verdict, also known as judgment on the evidence, is the same as the standard governing the trial court in making its decision." *Denman v. St. Vincent Med. Grp., Inc.*, 176 N.E.3d 480, 492 (Ind. Ct. App. 2021), *trans. denied*. Trial Rule 50(A) provides that "[w]here

all or some of the issues in a case tried before a jury … are not supported by sufficient evidence … the court shall withdraw such issues from the jury and enter judgment thereon or shall enter judgment thereon notwithstanding a verdict."  A party may move for a directed verdict "after another party carrying the burden of proof or of going forward with the evidence upon any one or more issues has completed presentation of his evidence thereon[.]"  T.R. 50(A).

[8]    The purpose of a Trial Rule 50(A) motion for judgment on the evidence is to test the sufficiency of the evidence presented by the non-movant.  *Stewart v. Alunday*, 53 N.E.3d 562, 568 (Ind. Ct. App. 2016) (citing *Purcell v. Old Nat'l Bank*, 972 N.E.2d 835, 839 (Ind. 2012)).  The grant or denial of a motion for judgment on the evidence is within the broad discretion of the trial court and will be reversed only for an abuse of that discretion.  *Hill v. Rhinehart*, 45 N.E.3d 427, 435 (Ind. Ct. App. 2015) (citing *Levee v. Beeching*, 729 N.E.2d 215, 223 (Ind. Ct. App. 2000)), *trans. denied*.  Upon appellate review of a trial court's ruling on such a motion, the reviewing court must consider only the evidence and reasonable inferences most favorable to the nonmoving party.  *Belork v. Latimer*, 54 N.E.3d 388, 394-395 (Ind. Ct. App. 2016).  A motion for judgment on the evidence should be granted "only when there is a complete failure of proof because there is no substantial evidence or reasonable inference supporting an essential element of the claim."  *Stewart*, 53 N.E.3d at 568 (quoting *Raess v. Doescher*, 883 N.E.2d 790, 793 (Ind. 2008) (quotation omitted), *reh'g denied*).  Likewise, judgment on the evidence is proper if the inference intended to be proven by the evidence cannot logically be drawn from the proffered evidence without undue speculation. *Hill*, 45 N.E.3d at 435 (citing *Levee*, 729 N.E.2d at 223[)].

*Overshiner v. Hendricks Reg'l Health*, 119 N.E.3d 1124, 1131 (Ind. Ct. App. 2019), *trans. denied*.

[9] LWG appeals the denial of its motions for a directed verdict following the denial of its motion to correct error. "[W]e review rulings on motions to correct error for an abuse of discretion." *Id.* "An abuse of discretion occurs when the trial court's decision is against the logic and effect of the facts and circumstances before the court or if the court has misinterpreted the law." *In re G.R.*, 863 N.E.2d 323, 325–26 (Ind. Ct. App. 2007).

## II.   Analysis

## A.   Denial of LWG's Motions for a Directed Verdict

[10] The Indiana Supreme Court has held that "determining whether evidence was sufficient 'requires both a quantitative and a qualitative analysis.'" *Purcell*, 972 N.E.2d at 840 (quoting *Am. Optical Co. v. Weidenhamer*, 457 N.E.2d 181, 184 (Ind. 1983)). "Evidence fails quantitatively only if it is wholly absent; that is, only if there is no evidence to support the conclusion." *Id.* "If some evidence exists, a court must then proceed to the qualitative analysis to determine whether the evidence is substantial enough to support a reasonable inference in favor of the non-moving party." *Id.*

[11]    "Qualitatively, ... [evidence] fails when it cannot be said, with reason, that the intended inference may logically be drawn therefrom; and this may occur either because of an absence of credibility of a witness or because the intended inference may not be drawn therefrom without undue speculation." *American Optical*, 457 N.E.2d at 184. The use of such words as "substantial" and "probative" are useful in determining whether evidence is sufficient under the qualitative analysis. *Id.* Ultimately, the sufficiency analysis comes down to one word:

"reasonable." *See, e.g.,* [*Raess*, 883 N.E.2d at 793] ("A motion for judgment on the evidence should be granted only when there is a complete failure of proof because there is *no substantial evidence or reasonable inference* supporting an essential element of the claim." (emphasis added) (citation and internal quotation marks omitted)); *Ross v. Lowe*, 619 N.E.2d 911, 914 (Ind. 1993) ("If there is any probative evidence or reasonable inference to be drawn from the evidence in favor of the plaintiff or if there is evidence allowing reasonable people to differ as to the result, judgment on the evidence is improper."); *Teitge v. Remy Const. Co. Inc.*, 526 N.E.2d 1008, 1010 (Ind. App. Ct. 1988) ("[J]udgment on the evidence is proper only where there is a lack of evidence of probative value upon one or more of the factual issues necessary to support a verdict, and no reasonable inference in favor of the plaintiff can be drawn from this evidence.").

*Id.* (brackets, ellipsis, and emphasis in original).

[12]     By its express language, Rule 50 acknowledges that a party must do more than simply present some evidence; in addition, that evidence must also be sufficient evidence. Unlike a motion for summary judgment under Rule 56, the sufficiency test of Rule 50(A) is not merely whether a conflict of evidence may exist, but rather whether there exists probative evidence, substantial enough to create a reasonable inference that the non-movant has met his burden.

*Id.* at 841. "The crux of the qualitative failure analysis under Rule 50(A) is 'whether the inference the burdened party's allegations are true may be drawn without undue speculation.'" *Id.* (quoting *Dettman v. Sumner*, 474 N.E.2d 100, 105 (Ind. Ct. App. 1985)).

[13]   Furthermore, we have concluded that

if a defendant unsuccessfully moves for a judgment on the evidence at the close of the plaintiff's case-in-chief, presents his own additional evidence thereafter, but renews his motion at the conclusion of all evidence, the motion is preserved in the traditional sense and is reviewed in light of only the evidence introduced during the plaintiff's case-in-chief. This explains why it is advantageous for the defendant to renew the motion. Where the defendant moves for judgment on the evidence at the close of the plaintiff's case-in-chief, presents his own evidence thereafter, but fails to renew the motion at the conclusion of all evidence, the motion is not completely "waived," because renewal is not a requirement under Rule 50. However, the motion must be reviewed in light of all evidence presented during the trial, because any evidence offered by the defendant may cure an otherwise erroneous denial of his motion for judgment on the evidence. Appellate review of the motion essentially becomes review for sufficiency of the evidence.

*Farmers Elevator Co. of Oakville v. Hamilton*, 926 N.E.2d 68, 76 (Ind. Ct. App. 2010), *trans. denied*; *see also Romero v. State*, 124 N.E.3d 1287, 1290–91 (Ind. Ct. App. 2019).

[14] The parties dispute whether LWG renewed its motions for a directed verdict at the close of evidence. While the City claims that LWG made only a general request for the trial court to enter judgment in its favor, LWG claims that it effectively renewed its motions for a directed verdict, mentioning the issues included in its motions for a directed verdict and specifically mentioning the words "directed verdict." While LWG, perhaps, could have been more specific in its arguments to the trial court, counsel did attempt to renew LWG's motions for a directed verdict, arguing the same grounds as were argued in the motions and referring to the motions themselves. As such, in reviewing whether the trial

court abused its discretion in denying LWG's motions for a directed verdict, we limit our review to only the evidence presented during the City's case-in-chief.

### 1. *Adverse Domination*

[15] "'Adverse domination is an equitable doctrine that tolls statutes of limitations for claims by corporations against its officers, directors, lawyers and accountants for so long as the corporation is controlled by those acting against its interests.'" *City of Marion II*, 169 N.E.3d at 390–91 (quoting *Clark v. Milam*, 192 W.Va. 398, 452 S.E.2d 714, 718 (1994)). "It 'applies to causes of action against the wrongdoing directors ... [and] against co-conspirators of the wrongdoers.'" *Id.* at 391 (quoting *Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 936 (7th Cir. 2012)) (brackets and ellipsis in original). The doctrine of adverse domination was "founded on the presumption that those who engage in fraudulent activity likely will make it difficult for others to discover their misconduct." *Id.* at 392.

[16]      "Generally, a corporation 'knows,' or 'discovers,' what its officers and directors know." *Clark*, 452 S.E.2d at 718. "But when officers and directors act against the interests of the corporation, their knowledge, like that of any agent acting adversely to his principal, is not imputed to the corporation." *Id.*; *see also Am. Heritage Banco, Inc. v. McNaughton*, 879 N.E.2d 1110, 1116 (Ind. Ct. App. 2008) (exception to the general rule of imputed knowledge when an agent acts adversely to the principal). A corporate plaintiff cannot "have 'knowledge' of an injury to itself until those individuals who control it know of the injury and are *willing to act on that knowledge*." [*Resol. Tr. Corp. v. Farmer*, 865 F. Supp. 1143, 1155 (E.D. Pa. 1994)] (emphasis added). In other words, where an "entity is dominated by those

whose own malfeasance might be revealed in the course of litigating a complaint, it follows the entity has not 'discovered' the injury to its interests in any meaningful way." [*Resol. Tr. Corp. v. O'Bear, Overholser, Smith & Huffer*, 840 F. Supp. 1270, 1284 (N.D. Ind. 1993)]. The doctrine is based "on the theory that it is impossible for the corporation to bring the action while it is controlled, or 'dominated,' by culpable officers and directors." [*F.D.I.C. v. Smith*, 980 P.2d 141, 144 (Or. 1999)]. Wrongdoing officers and directors "cannot be expected to sue themselves or to initiate any action contrary to their own interests." *Id.* Thus, the statute of limitations is tolled as long as a corporate plaintiff is controlled by the alleged wrongdoers. *Id.*

*Id.* at 391.

[17] The Indiana Supreme Court has limited the application of the adverse-domination doctrine to cases "in which intentional wrongdoing is involved" so as not to "'overthrow the statute of limitations completely in the corporate context." *Id.* at 392 (quoting *F.D.I.C. v. Dawson*, 4 F.3d 1303, 1312 (5th Cir. 1993)). The doctrine applies to both private and municipal corporations. *Id.* In addition, "[i]t is well established that the doctrine also applies to causes of action against co-conspirators of the wrongdoers who adversely dominate the entity." *Id.*

[18] In denying LWG's motion for a directed verdict on adverse domination grounds, the trial court found as follows:

> To avoid a directed verdict on its adverse domination defense, the City must have introduced evidence supporting a conclusion that Mayor Seybold engaged in intentional wrongdoing, that LWG was complicit in the wrongdoing, and that no one else had the knowledge, capability and motivation to bring suit.

The City's evidence provides a basis for reasonable inferences that: The Mayor formed a personal relationship with Michael An, and thereafter directed $2.5 million of public money toward An's YMCA project without objectively establishing An's credentials as a developer. Members of the Mayor's administration who served at the pleasure of the Mayor facilitated the financing of the $2.5 million. Disbursements of the $2.5 million were made without An having to meet the conditions precedent set out within the bond indenture. LWG was complicit in this wrongdoing, in that Mr. Swintz sent an email urging the First Farmers trustee to disburse funds to An, although Mr. Swintz knew that An had not provided acceptable proof of the additional $3 million he was required to commit before being entitled to disbursement. An made payments to Mayor Seybold for a campaign contribution, to pay the Mayor's life insurance premium, and to the Mayor's wife. An also hired the Mayor's brother Chad to work on the YMCA project. When KPMG was hired to investigate or audit the YMCA project, Chad refused to turn over receipts of project expenditures, citing a non-disclosure agreement with Mr. An. Mayor Seybold's administration did not insist on seeing the agreement to determine if this claim was legitimate, did not seek relief from the NDA from Mr. An, and did not ask the City Council to invoke its subpoena power to obtain these records, pursuant to I.C. 36-4-6-21.

The YMCA project was a significant commitment of public money, and became a source of local controversy when the public money was spent and the project not completed. If the Mayor's administration was serious about investigating the project, there were easily available steps that were not taken. The city administration took "no" as an answer from the Mayor's brother, and did little else to get to the bottom of the issue. This evidence could be interpreted by a reasonable jury as proof that the Mayor engaged in intentional wrongdoing, and this in turn made it difficult or impossible for others at the City to discover and act on evidence of this wrongdoing.

LWG can defeat an otherwise proven claim of adverse domination if it establishes another person or entity had the ability, knowledge, and motivation to bring suit despite the Mayor's adverse domination, and failed to do so. [LWG] identifies the Redevelopment Commission as that entity, citing I.C. 36-7-14-12.2(11). That section does provide that the Redevelopment Commission has the ability to bring suit in the name of the City. This establishes that the Commission had the ability to bring suit, but not that it also had the knowledge and motivation to do so. Mr. Hunt's testimony described that economic development project presentations made to the City's deliberative bodies were typically brief oral presentations made either by persons subject to the Mayor's appointment/retention authority, or by persons hired by these [persons]. A jury could reasonably infer that if the Mayor did not want the deliberative bodies to be aware of facts implicating the Mayor in wrongdoing, that he would discourage members of his administration from making these facts known to these bodies, including the Redevelopment Commission. Without a showing of the bodies' knowledge and motivation to bring suit, the mere statutory capability is insufficient.

[The City's] evidence would permit a reasonable jury to conclude Mayor Seybold did adversely dominate the City during his term in office. Through cross-examination and impeachment, LWG has challenged many of the inferences in favor of [the City] listed above, and the jury may ultimately not accept the City's position after all evidence for both sides has been brought forth. For example, Chad Seybold testified that he was hired by Mr. An solely through Chad's own merit, over the strenuous objections of his brother the Mayor. And Mr. Kleinrichert testified that Mr. An had roughly $38,000 of his own, non-bond related funds in his account from which he could have made the payments to the Mayor and his Wife. The jury has the prerogative to reject Chad Seybold's self-serving statements that the Mayor was uninvolved in his selection by Mr. An. Likewise, the jury could conclude that Mr. An's payments to the Seybolds from the account

receiving YMCA bond money were at least in some proportion made from bond proceeds, as Mr. An was commingling his personal funds with corporate assets in a non-businesslike manner.

Appellant's App. Vol. II pp. 79–81. LWG challenges the trial court's determination that the City presented sufficient evidence of both intentional wrongdoing and domination by Mayor Seybold to survive its directed verdict motions. Specifically, LWG asserts that "[a]t bottom, the trial court's conclusions with respect to intentional wrongdoing by the Mayor amount to nothing more than unsupported innuendo" and "[s]imply put, the City failed to adduce any evidence that Mayor Seybold did anything that could qualify as intentional wrongdoing." Appellant's Br. pp. 34, 36.

### a. Intentional Wrongdoing

[19] With regard to the trial court's determination that the City's evidence supported a reasonable inference of intentional wrongdoing by Mayor Seybold, LWG argues that "[e]ven assuming such inferences were properly drawn from the sparse evidence adduced from the City's five witnesses, they come nowhere close to establishing *intentional wrongdoing* by Mayor Seybold." Appellant's Br. p. 30 (emphasis in original). In support, LWG cites to the United States Court of Appeals for the 5th Circuit's decision in *Dawson* in which the Federal Deposit Insurance Corporation ("FDIC") sued certain individuals connected to a failed bank, Texas Investment Bank, N.A. ("TIB"). 4 F.3d at 1305. The FDIC alleged that Dawson, TIB's former president, and other board members had made a series of eighty-two unsafe and unsound loans between February of

1982 and October of 1984, which constituted unsafe and unsound banking policies "that should have been detected and prevented by Dawson and the other members of TIB's board of directors." *Id.* Some of the defendants moved to dismiss the lawsuit, claiming that it was barred by the applicable statute of limitations. *Id.* at 1306. For its part, the FDIC argued that the statute of limitations did not apply because of the doctrine of adverse domination. Upon review, the 5th Circuit concluded that

> [t]he FDIC's own evidence tended to show that most of TIB's directors may have been negligent in failing to supervise the lending functions. Yet, at the same time, the board never concealed its "serious deficiencies" from examination by the OCC or anyone else. Even after the OCC notified TIB's board of its shortcomings in supervising TIB's lending function, there is no evidence to suggest that an organized majority coalesced to prevent any other parties from discovering the problems.

4 F.3d at 1312. Thus, the 5th Circuit determined that the adverse-domination theory was inappropriate as the evidence established mere negligence rather than intentional wrongdoing. *Id.*

[20] LWG also cites to the 5th Circuit's decision in *Resolution Trust Corp. v. Acton*, 49 F.3d 1086 (5th Cir. 1995) ("*Acton I*"). In *Acton I*, the defendants, who were former directors of HeritageBanc Savings Association ("HeritageBanc"), were alleged to have breached their fiduciary duties and committed gross negligence with respect to their oversight duties for HeritageBanc. 49 F.3d at 1088–89. Charles Acton, the chairman of the board and president of HeritageBanc appointed his wife, two daughters, and father-in-law as officers of HeritageBanc

and/or one of its subsidiaries. *Resol. Tr. Corp. v. Acton*, 844 F. Supp. 307, 310–11 (N.D. Tex. 1994) ("*Acton II*"). Acton's two sons-in-law were also active in bank operations. *Id.* at 311. In alleging adverse domination, the plaintiff alleged that HeritageBanc had circumvented regulation by making "a number of imprudent transactions." *Id.* These allegedly imprudent transactions included (1) the sale of land owned by HeritageBanc to a member of Acton's family for $0.64 per square foot only for the bank to repurchase the land four months later at a rate of $6.50 per square foot, (2) 100% financing for the purchase of land by a client from HeritageBanc and one of Acton's family members, and (3) make a series of loans to allegedly insolvent entities. *Id.* Based on these transactions, Acton and the other board members were alleged to be grossly negligent. On appeal, the 5th Circuit concluded that negligence, even if gross in nature, "is not enough to toll limitations" under the doctrine of adverse domination. *Acton I*, 49 F.3d at 1092.

[21]     Finally, LWG cites to the United States District Court for the Northern District of Texas's decision in *U.S. Bank National Ass'n v. Verizon Communications, Inc.*, 2012 WL 3100778 (N.D. Tex. July 31, 2012), in which an independent board that had allegedly been chosen by Verizon was alleged to have engaged in adverse domination by engaging in allegedly tainted business dealings with Verizon. The court concluded that the board members had not engaged in intentional wrongdoing and, as such, the adverse-domination doctrine did not apply to toll the statute of limitations. *Verizon*, 2012 WL 3100778 at *15.

[22]     LWG asserts that the acts involved in each of the three cited cases are arguably worse than the alleged acts committed by Mayor Seybold, suggesting that Mayor Seybold's acts could not reasonably have been classified as intentional wrongdoing. Specifically, LWG asserts that "[n]one of the evidence proffered in the City's case-in-chief demonstrated any conduct by Mayor Seybold as egregious as the conduct shown in these decisions, all of which was held not to meet the standard of intentional wrongdoing." Appellant's Br. pp. 32–33.

[23]     Despite LWG's assertion, with respect to the alleged intentional wrongdoing by Mayor Seybold, the City's case-in-chief contained evidence indicating that Mayor Seybold had received improper financial benefits from An in the form of cash payments to his wife and political campaign and premium payments on a life insurance policy with these benefits being financed solely or at least in part from bond proceeds. Specifically, the City presented evidence that showed that An had made cash payments to Mayor Seybold's wife and his political campaign as well as had made premium payments on a life insurance policy taken out for Mayor Seybold's benefit. An issued a $1000.00 check made payable to Mayor Seybold's wife, Jennifer, from funds which, based on the account the check came from, Kleinrichert testified "with 100 percent certainty" came "from the bonds." Tr. Vol. IV p. 138. Other payments came from accounts in which An is alleged to have co-mingled personal and bond funds, with "[b]etween 98 and 99 percent of the money" in those accounts coming from bond proceeds. Tr. Vol. IV p. 110. An was listed as the "premium payor" of the $792.48 annual premium on the life insurance policy

taken out for Mayor Seybold's benefit. Appellee's Addendum p. 37. Kleinrichert further testified that he had seen no indication that either the life insurance premiums or the $1000.00 payment to Jennifer Seybold had ever been reimbursed by Mayor Seybold and that he had been able to "follow 100 percent of the bond money" to see where it had gone and how it had been spent. Tr. Vol. IV p. 111. This evidence supports a finding, at the very least, that the $1000.00 payment to Jennifer came from bond proceeds and, the jury could reasonably infer that it was very probable that the other payments also came from bond proceeds.

[24] The City also introduced evidence that An and Chad had failed to cooperate with the initial investigation into use of bond funds that was conducted during Mayor Seybold's time in office, with Chad citing a non-disclosure agreement with An. While the City does not cite to any evidence specifically indicating that Mayor Seybold instructed An and Chad to refuse to cooperate with the investigation, there is no evidence indicating that Mayor Seybold took any action to ensure cooperation with the investigation by either his brother or An. While this evidence itself falls short of establishing intentional wrongdoing by Mayor Seybold, this evidence was not considered in isolation but together with the other evidence relating to the alleged intentional wrongdoing by Mayor Seybold.

[25] In denying LWG's motion for a directed verdict, the trial court also cited evidence indicating that disbursements of the $2.5 million bond proceeds were made without An having to meet the conditions set out in the bond indenture.

While An was initially required to submit proof of funding before bond proceeds would be released by First Farmers, *i.e.*, the bank through which bond proceeds were released, the City introduced evidence that "Mayor Seybold, for and on behalf of the City of Marion, waived the documentation requirements of Section 4.3 of the Trust Indenture, and further instructed First Farmers to cooperate and work through Chad Seybold." Ex. Vol. 11 p. 36. The City further provided evidence establishing that while a document referred to as the Cho Memorandum claimed to provide proof that An had secured funding to complete the YMCA project, "[a] competent financial advisor reading the [Cho Memorandum] would recognize readily that it did not do so." Tr. Vol. III p. 228. As it was, the Cho Memorandum was not disseminated to all relevant City officials or to First Farmers.

[26] The trial court also cited evidence that Mayor Seybold did not objectively establish An's credentials as a developer before directing $2.5 million of public money toward the YMCA project, with the City presenting the expert testimony of Robert Doty, a financial advisor in the municipal bond market who was hired to review the circumstances relating to the YMCA project. Doty testified that (1) he had not "seen evidence that [An] had experience in developing this type of project" and (2) An "didn't approach the transaction in the way that many developers would approach a bond finance transaction. He didn't have a lawyer who understood bond finance for development projects. He didn't have an accountant or didn't have a bank advising him." Tr. Vol. III p. 240. In addition, An hired Mayor Seybold's brother, Chad, to work as

project manager on the YMCA project despite the fact that Chad had not had any experience building a boutique hotel "or anything like that." Tr. Vol. III p. 15.

[27] The trial court considered all of the above-discussed evidence, which again was presented during the City's case-in-chief, and determined that a directed verdict was improper because there was sufficient evidence to support a reasonable inference of wrongdoing, or at least that would allow reasonable persons to differ as to the result. *See Purcell*, 972 N.E.2d at 840. Upon review, we reach the same conclusion as the trial court.

### b. Domination

[28] In addition to proving intentional wrongdoing, the City was also required to prove that Mayor Seybold had dominated the City. *City of Marion II*, 169 N.E.3d at 396. "An affirmative showing of domination would require a city to show that its mayor was exercising its ability to supervise and control the City Attorney, and others who could investigate the mayor's own wrongdoing." *Id.* at 397.

[29] LWG asserts that the City failed to present sufficient evidence to defeat its motion for a directed verdict on the question of whether Mayor Seybold had dominated the City. LWG claims that "the City presented no evidence during its case-in-chief that Mayor Seybold did anything to exercise domination over the city attorney" or the City's Redevelopment Commission, both of whom had the authority to file suit on behalf of the City. Appellant's Br. p. 39.

[30]     While the Redevelopment Commission may have had the statutory power to file suit on behalf of the City, three of its five members were appointed by Mayor Seybold and any or all of those three members could have been removed by him without cause. *See* Ind. Code §§ 36-7-14-6.1(a) ("The five (5) commissioners for a municipal redevelopment commission shall be appointed as follows: (1) three (3) shall be appointed by the municipal executive.), 36-7-14-9(a) ("The municipal executive … that appointed a municipal redevelopment commissioner may summarily remove that commissioner from office at any time."). In addition, while LWG is correct that the Redevelopment Commission has the power to "[i]nstitute or defend in the name of the unit any civil action," Indiana Code section 36-7-14-12.2(a)(11), the statute does not explicitly grant the Redevelopment Commission the statutory power to investigate alleged wrongdoing by the City's executive. *See* Ind. Code § 36-7-14-12.2.[2] Further, given that the Redevelopment Commission had not received either the Cho Memorandum or any information relating to how the Bond proceeds had been spent, the a fact-finder could reasonably infer that the Redevelopment Commission had not, during the relevant time period, had any reason to believe that it was necessary to bring a lawsuit on the City's behalf.

---

[2] Indiana Code section 36-7-14-12.2 was amended effective January 1, 2023. The current version of the statute still does not appear to give the Redevelopment Commission the statutory power to investigate alleged wrongdoing by the City's executive.

[31]    In addition, Tom Hunt, who became corporate counsel for the City on September 1, 2014, testified that neither he nor his predecessor could have filed a lawsuit relating to the YMCA project without Mayor Seybold's approval. Specifically, Hunt testified that both he and his predecessor "served at the pleasure of the mayor, took directions from the mayor, and did projects as the mayor directed." Tr. Vol. II p. 91. Hunt further testified that he was never directed by Mayor Seybold "to look into whether the [C]ity had any legal rights that it could enforce to require" An to complete the project. Tr. Vol. II p. 90.

[32]    Furthermore, despite LWG's claim to the contrary, the City's case-in-chief included evidence from which a reasonable fact-finder could infer that Mayor Seybold had impeded the KPMG investigation. Again, the City's evidence established that neither Chad nor An had cooperated with the KPMG investigation, with Chad claiming that he "was not able to because [he] was under a non-disclosure agreement with [An]." Tr. Vol. III p. 106. The Indiana Supreme Court discussed Chad's actions and Mayor Seybold's alleged control over the KPMG investigation in *City of Marion II*, stating

> Here, the KPMG investigation was initiated by Mayor Seybold's office. But it never came close to revealing any wrongdoing because Mayor Seybold's own brother refused to give KPMG the receipts necessary to perform an investigation. And Mayor Seybold never asked Chad to turn over the receipts, further establishing a genuine issue of material fact as to Mayor Seybold's willingness to redress the City's injures. *The reasonable inference to draw here is that Mayor Seybold would not allow an investigation into the project, and his alleged wrongdoing, to succeed*.

169 N.E.3d at 394–95 (emphasis added).  We agree with the Indiana Supreme Court that Chad's refusal to cooperate with the investigation together with Mayor Seybold's failure to request that Chad and An cooperate with the investigation supports the reasonable inference that Mayor Seybold exerted control over the investigation such that any wrongdoing on his behalf would not be discovered.

[33]  Further, although Hunt provided another city employee, who also served at the pleasure of the mayor, a name of someone at KPMG, he did not hear anything about what happened to the KPMG investigation until after Mayor Seybold had left office.  It seems unlikely that the City attorney, *i.e.*, Hunt, would not have had at least some knowledge of or been involved at some level in an investigation into issues relating to city spending/funding.  The trial court found that "[a] jury could reasonably infer that if the Mayor did not want the deliberative bodies to be aware of facts implicating [him] in wrongdoing, that he would discourage members of his administration from making these facts known to these bodies, including the Redevelopment Commission." Appellant's App. Vol. II p. 81.[3]

[34]  Upon review, like the trial court, we conclude that the evidence presented in the City's case-in-chief was such that reasonable persons could differ as to the

---

[3] The City also argues that the tolling of the statute of limitations was warranted due to the doctrine of fraudulent concealment.  The trial court, however, did not base its ruling on this doctrine and we accordingly limit our focus to the parties' arguments relating to adverse domination.

result. As such, we agree with the trial court's determination that it would have been improper for the trial court to have entered a directed verdict in favor of LWG on the question of whether Mayor Seybold dominated the City during the relevant time period. *See Purcell*, 972 N.E.2d at 840.

### c. LWG's Complicity

[35] The City also presented evidence of LWG's complicity, mainly through the actions of LWG employee Bob Swintz, who had acted as a financial advisor for Mayor Seybold's administration. Swintz was one of the few individuals who had received the Cho Memorandum. Doty opined that Swintz should have "delivered that document to the key decision makers, the financial decision makers of the city, the Common Counsel, the city commissions, the Economic Development Director, and the mayor" and "warned the city that the [Cho Memorandum] was a red flag that funding was not available to complete the project and that the city needed to take action to protect itself." Tr. Vol. III p. 228. Hunt testified that the Economic Development Commission would not have been able to find that the YMCA project would create a public benefit had it known An did not have requisite funding. Specifically, Hunt testified that

> if the Commission knew about it, it would have been difficult for them to make the … finding that … a public benefit to the area to be developed would result, because if … [An] didn't have the money to complete the project, then the project never got off the ground and there would be no benefit. So if the Commission … had been informed that the … developer was underfunded, then they could not have made that … finding.

Tr. Vol. II p. 81. It appears that, at the very least, Swintz was complicit in keeping the Cho Memorandum from relevant city officials.

[36] In addition, Doty opined that Swintz had "acted against the city's best interest" in giving certain advice to Chad, which had enabled Chad "to circumvent, key protections, important protections in the trust indenture for the city requiring that reimbursement be made only for costs that had already been spent on the project." Tr. Vol. III p. 228. Doty further opined that in 2011, Swintz had "voluntarily made an affirmative recommendation to the Common Counsel that the 2009 bonds be refinanced" without forming a reasonable basis for that recommendation or informing the Counsel that "the transaction created new risks for the city." Tr. Vol. III p. 229. The City also introduced various emails which, at the very least, supported a reasonable inference that Swintz had been aware of and had acted in a manner complicit with Mayor Seybold's actions. Swintz's testimony indicated that he had made false, or at the very least misleading, statements to First Farmers and KPMG during communications regarding the bonds and the subsequent investigation into the use of the bond funds. The above-stated evidence is sufficient to have rendered entry of a directed verdict on the question of complicity improper. *See Purcell*, 972 N.E.2d at 840. In sum, we conclude that the trial court did not abuse its discretion in denying LWG's motion for a directed verdict on the City's claim of adverse domination.

### 2.    *LWG's Liability*

[37] LWG additionally contends that "[i]n addition to being time-barred, the City's claims against [LWG] are without merit." Appellant's Br. p. 42. Thus, LWG asserts that the trial court erred in denying its motions for a directed verdict "on both the negligence and fiduciary duty claims." Appellant's Br. p. 43 (emphasis omitted). For its part, the City contends that the trial court did not abuse its discretion as its case-in-chief contained sufficient evidence to survive LWG's motions for a directed verdict.

### i.    *The City's Negligence Claim*

[38] With respect to the City's negligence claim, LWG asserts that "the City submitted no evidence as to what constitutes the applicable standard of care for negligence as against [LWG]." Appellant's Br. p. 43. LWG further asserts because such evidence was necessary to prove the City's negligence claim, the trial court abused its discretion in denying LWG's motion for a directed verdict.

[39] LWG points to Doty's testimony, wherein he indicated that the negligence standard of care and the fiduciary standard of care are different, with the fiduciary standard of care being higher. LWG also points to Doty's admission on cross-examination that "[i]f you looked at [LWG's] conduct from just the standard of care applicable to negligence," it is possible that there may not have been a breach of the negligence standard. Tr. Vol. IV p. 21. Doty also testified, however, regarding the ways he believed LWG, through Swintz, had breached the relevant standards of care, outlining actions which he believed Swintz should have taken in order to have acted as a competent financial advisor. The

evidence was sufficient to create a question for the jury as it could support a reasonable inference in favor of the City. *See Purcell*, 972 N.E.2d at 840. The trial court, therefore, did not abuse its discretion in denying LWG's motion for a directed verdict.

### ii.     The City's Fiduciary-Duty Claim

[40]     Statements relating to the standard of care given by competent fiduciaries were spaced throughout Doty's expert testimony. LWG acknowledged that Doty had addressed the standard of care but claims that the trial court abused its discretion in denying its motions for a directed verdict because Doty had "merely assumed that [LWG] owed the City a fiduciary duty at the time the 2009 bond was issued." Appellant's Br. p. 45. LWG argues that its fiduciary duty was not established until after the 2009 bonds were issued. Swintz's testimony at trial, however, seems to indicate otherwise.

[41]     LWG alternatively argues that even if it had a fiduciary duty to the City prior to the issuance of the bonds, Doty's opinions do not support an inference that LWG had breached said duty. Doty opined otherwise, testifying that he believed that LWG had breached its duty in three ways. First,

> Swintz received a very important document from Chad Seybold intended for the city. I'll refer to it as the [Cho Memorandum]. The [Cho] Memorandum claimed to provide proof that funding was available to complete the YMCA project in the city. A competent financial advisor reading the [Cho Memorandum] would recognize readily that it did not do so. Mr. Swintz should have delivered that document to the key decision makers, the financial decision makers of the city, the Common Counsel, the

city commissions, the Economic Development Director, and the mayor. In addition, he should have warned the city that the [Cho Memorandum] was a red flag that funding was not available to complete the project and that the city needed to take action to protect itself.

Tr. Vol. III p. 227–28. Second,

Swintz voluntarily undertook to provide advice to Mr. Chad Seybold, the local representative of the developer, an adverse party to the city. In doing so, Mr. Swintz acted against the city's best interest. He advised Mr. Seybold that there was no problem with submitting a reimbursement request the next day at the bond closing of -- for monies that had not been expended on the YMCA project. In doing so, Mr. Swintz'[s] advice to Mr. Seybold allowed Mr. Seybold to circumvent, key protections, important protections in the trust indenture for the city requiring that reimbursement be made only for costs that had already been spent on the project.

Tr. Vol. III p. 228. Third,

Swintz voluntarily made an affirmative recommendation to the Common Counsel that the 2009 bonds be refinanced. In doing so, Mr. Swintz failed to do his homework to form a reasonable basis for that recommendation. In addition, Mr. Swintz failed to make a presentation to the Common Counsel that was balanced stating the pros and cons. He omitted to mention that the transaction, even though he presented positive information, he omitted to mention that the transaction created new risks for the city…. Those specific new risks were that a mortgage on the project and a personal guarantee by Mr. An, the developer, would be eliminated.

Tr. Vol. III p. 229.

Doty gave specific examples of why he believed that LWG, through Swintz, had violated its fiduciary duty. Again, the evidence was sufficient to create a question for the jury as it could support a reasonable inference in favor of the City. *See Purcell*, 972 N.E.2d at 840. The trial court, therefore, did not abuse its discretion in denying LWG's motion for a directed verdict.[4]

## B.    Whether the Damages Awarded by the Jury Are Excessive

Alternatively, LWG contends that "[a]t an absolute minimum, the jury's award of over $3 million based on [LWG's] supposed deficiencies cannot possibly be sustained." Appellant's Br. p. 50.

> "Damages are particularly a jury determination." *Prange v. Martin*, 629 N.E.2d 915, 922 (Ind. Ct. App. 1994), *trans. denied*. "No particular degree of mathematical certainty is required in awarding damages." *Greives v. Greenwood*, 550 N.E.2d 334, 339 (Ind. Ct. App. 1990). "We will not deem a verdict to be the result of improper considerations, unless it cannot be explained on any other reasonable ground." *Prange*, 629 N.E.2d at 922. "Our inability to look into the minds of jurors and determine how they computed an award is, to a large extent, the reason behind the rule that a verdict will be upheld if the award falls within the bounds of the evidence." *Weinberger v. Boyer*, 956 N.E.2d 1095, 1113 (Ind. Ct. App. 2011), *trans. denied* (2012). "[I]f there is any evidence in the record which supports the

---

[4] As the City points out in its brief, LWG did not include any argument relating to the City's constructive-fraud claim in its initial brief. Although LWG argues in its reply brief that the trial court abused its discretion by denying its motions for a directed verdict as they related to the constructive-fraud claim, this argument is waived as LWG had not challenged the trial court's order in this regard in its initial brief. *See Moriarty v. Moriarty*, 150 N.E.3d 616, 631 n.10 (Ind. Ct. App. 2020) (providing that an appellant may not raise new arguments in its reply brief), *trans. denied*.

amount of the award, even if it is variable or conflicting, the award will not be disturbed." *Prange*, 629 N.E.2d at 922.

*Husainy v. Granite Mgmt., LLC*, 132 N.E.3d 486, 493–94 (Ind. Ct. App. 2019). Stated differently,

> [t]he verdict will be reversed only when it is apparent from a review of the evidence that the amount of damages awarded by the jury is so small or so great as to clearly indicate that the jury was motivated by prejudice, passion, partiality, corruption or that it considered an improper element.

*Dee v. Becker*, 636 N.E.2d 176, 177 (Ind. Ct. App. 1994).

[44] The jury found that LWG was 95% at fault and awarded $3,121,624.00 in damages against LWG. LWG claims that

> [i]t is utterly implausible to put 95% of the blame for the entirety of those damages on the accounting firm whose role was very limited, given the wrongdoing of others, including the developer and originator of the project, An, Chad, and many others. The over $3 million award simply cannot be sustained as having been caused exclusively by [LWG's] actions.

Appellant's Br. p. 51. LWG asserts that its allegedly limited role does not support the "outrageous damages award made against it" and "[a]t a minimum, the award should be vacated." Appellant's Br. p. 52.

[45] Although LWG claims that its involvement with the YMCA project and the bond financing was limited, the jury found otherwise, concluding that LWG had played an active role, or at least had been complicit, in the wrongdoing of others. In addition to the evidence discussed above, which again was limited to

evidence that was presented during the City's case-in-chief, additional evidence was presented during trial that implicated LWG, or its representatives, as having played an active role in the actions relating to the funding of the YMCA project. LWG had owed a duty to the City, not Mayor Seybold. The jury determined that LWG had breached that duty and, as a result, the City had suffered damages. The jury's award of damages was consistent with the damages that it found the City had incurred in connection to the YMCA project. As such, the jury's award of damages was not excessive.

[46] The judgment of the trial court is affirmed.

Riley, J., and Weissmann, J., concur.