AMERICAN OPTICAL COMPANY, U.S. Safety Service Company and Warner Lambert Company, Appellants (Defendants Below),

v.

Chris M. WEIDENHAMER, Appellee (Plaintiff Below),

and

International Harvester Company, Appellee (Defendant Below).

Nos. 1283S448, 2–1276A462.

Supreme Court of Indiana.

Dec. 16, 1983.
Rehearing Denied Feb. 20, 1984.

John M. Clifton, Jr., John F. Lyons, Barrett, Barrett & McNagny, Fort Wayne, for appellants American Optical Co. and Warner Lambert Co.

Carl J. Suedhoff, Jr., Hunt, Suedhoff, Borror, Eilbacher & Lee, Fort Wayne, for appellant U.S. Safety Service Co.

Stephen L. Williams, Sherrill William Colvin, Snouffer, Haller & Colvin, Fort Wayne, for appellee Chris M. Weidenhamer.

PRENTICE, Justice.

This cause is before us upon the petition of defendant, appellant, American Optical Company, a division of Warner Lambert Company, (hereinafter called "American") for transfer from the Court of Appeals, Fourth District, which affirmed, in part, and reversed, in part, the judgment of the trial court awarding damages to the plaintiff, appellee, against American and a co-defendant, U.S. Safety Service Company, (hereinafter called "U.S."). The decision and opinion of the Court of Appeals appears at 404 N.E.2d 606.

The petition to transfer is now granted pursuant to Ind.R.App.P. 11(B)(2)(f) in that said decision contravenes a ruling precedent of this court holding that a manufacturer has no duty to warn of danger that is open and obvious. *Bemis Company v. Rubush*, (1981) Ind., 427 N.E.2d 1058 (Rehearing denied 2/10/82).

The action in the trial court arose from severe eye injuries received by Plaintiff (Appellee) while working at a large metal turning lathe for his employer, International Harvester Company (hereinafter called "Harvester"). Harvester was also named a co-defendant, but its motion for judgment on the evidence, filed at the conclusion of Plaintiff's evidence, was sustained. The correctness of that ruling has not been challenged on appeal. Like motions by American and by U.S. were overruled.

Plaintiff was wearing safety glasses when the accident occurred, but the right lens broke when it was struck a severe blow by a hoist used to lift castings in and out of the lathe cradle. Fragments from the broken lens cut his eyeball and resulted in substantial and permanent impairment of his vision.

At the time of the accident and for several years prior thereto, Harvester employees in the factory were required to wear safety glasses while working, and it furnished glasses for that purpose. The glasses so furnished consisted of frames and lenses manufactured and sold to Harvester by both American and by U.S. The lenses were held in the frames by friction. All lenses fit all frames, and it was customary to replace scratched or damaged lenses, from time to time, with new ones and to utilize the old frames. Both complete glasses and replacement lenses were provided through the "safety crib" operated by Harvester employees. Most frames were plastic, for which the employees paid a small charge. But both initial lenses and replacement lenses were furnished by Harvester at no cost to the workers.

Plaintiff's complaint alleged that the broken lens was defective and had been manufactured by *either* American or by U.S., and postulates, on appeal, that inasmuch as his evidence reflects that the allegedly defective lens was manufactured by one or the other of such defendants, the burden was upon each to prove that it did not do so and that if neither carries that burden, both may be held liable. The Court of Appeals did not respond upon this issue but, instead, determined that Plaintiff was bound by his own testimony that he was wearing frames and lenses supplied by American when the accident occurred and that, therefore, the trial court should have sustained the motion filed by U.S. for judgment upon the evidence. After a detailed review of all of Plaintiff's evidence, we would be hard pressed to agree that his testimony was "clear and unequivocal" that he was wearing American glasses and lenses at that time. However, we reach our decision herein upon the issue of causation; hence we need not concern ourselves with the identity of the manufacturer.

■ Plaintiff's complaint was based upon the multiple theories of negligence, breach of implied warranty of merchantability and fitness for a particular purpose, breach of express warranty and strict liability in tort. It is axiomatic that in order to impose liability upon any defendant under any of the foregoing theories, it was incumbent upon Plaintiff to prove, by a preponderance of the evidence, that his injury was the proximate result of the breach of some duty owed him by one or more of the defendants. This, he failed to do. "To prove a defect, a plaintiff is not required to eliminate with certainty all possible causes of an accident; it is sufficient if the evidence reasonably eliminates improper handling or misuse of the product by others than the manufacturer, thus permitting the jury to reasonably infer that it was more probable than not that the product was defective. But there is also authority to the effect that the requirement of showing a defect cannot be satisfied by reliance on the doctrine of res ipsa loquitur." *63 Am. Jur.2d 136, Products Liability § 130.*

Appellant has correctly cautioned us that in determining whether or not the trial court erred in denying the motions of American and U.S. for judgment upon the evidence, we are governed by the rules applied in *Mamula v. Ford Motor Co.*, (1971) 150 Ind.App. 179, 181, 275 N.E.2d 849:

"'On appeal we will consider only the evidence most favorable to the party against whom the motion for directed verdict was made and all reasonable inferences from such evidence.'" (citations omitted.)

"'It is only where there is a *total absence of evidence* or legitimate inferences in favor of plaintiff upon the issues, or where the evidence is without conflict and is susceptible of but one inference and that inference in favor of the defendant, that the court may give a peremptory instruction.'" (citations omitted.)

We do not, by this citation, however, approve of all that was said there. Determining whether or not evidence is sufficient for the purpose proffered requires both a quantitative and a qualitative analysis with the avowed purpose of determining whether or not it can be said, with reason, that such purpose was thereby fulfilled. If opposite conclusions could, with reason, be drawn, then it cannot be said that the evidence was insufficient. The key word that is present in all of our variously worded explanations, by inference if not expressly, is "reasonable." Quantitatively, evidence may fail only if it is absent, that is only when there is none at all. Qualitatively, however, it fails when it cannot be said, with reason, that the intended inference may logically be drawn therefrom; and this may occur either because of an absence of credibility of the witness or because the intended inference may not be drawn therefrom without undue speculation. The use of such words as "substantial" and "probative" are useful in articulating the methodology, because they focus our attention upon the qualitative aspects of the issue and succor objectivity where subjectivity is wont to go.

All of the evidence with respect to how the accident occurred came from Plaintiff and his witnesses.

There were no eye witnesses to the accident, other than the plaintiff, himself, and he testified that he did not know how it happened. He was working at the lathe when he was suddenly knocked off his feet, fell to the floor and felt excruciating pain in his right eye, which was bleeding.

Darrell Thompson, Jr., was Plaintiff's foreman. He escorted Plaintiff to the dispensary immediately and then returned to the scene of the accident and, as was his designated responsibility, attempted to determine how it occurred. He found Plaintiff's safety glasses on the floor. The left lens was intact, but the right one had been broken. He picked up the glasses and such pieces of broken glass as he could find, put them in an envelope and delivered them to the Harvester safety department.

Alvin Berry was a union designated safety committeeman in the factory. In accordance with his responsibilities in that capacity, he went to the scene of the accident to investigate. When he arrived, Plaintiff was not there, but he found sixteen or eighteen pieces of broken safety glass on the floor and concluded that Plaintiff had sustained an eye injury. The bits of glass ranged in size "from the size of a match head to about half a dime." He put the glass fragments in an envelope and placed them on the safety supervisor's desk.[1]

The lathe at which Plaintiff had been working was approximately ten feet long and was approximately four feet wide at its base. Plaintiff had been cutting iron castings, called differential carriers, in the lathe. The castings are about eighteen inches in diameter and weigh approximately ninety pounds. They are stacked upon pallets about five feet behind the lathe operator prior to the cutting and are lifted, transported and positioned in the lathe by means of an electrically operated hoist. When properly positioned, the castings are secured in the lathe by means of a hand operated wrench while they are still connected to the hoist. Proper operating procedure required that the castings be released from the hoist when so secured and that the hoist be then returned to a position approximately three feet behind the operator. The castings are then further secured upon the lathe chuck, which is located on a spindle, by electrically operated "chuck jaws," and not until they are so secured is the revolving action of the casting against the cutting tool commenced.

Witness Thompson, after having inspected the scene, being familiar with the prescribed lathe operation procedures and having observed Plaintiff performing such work, concluded that Plaintiff had accidently or inadvertently activated the chuck, causing it to rotate prematurely, while the casting which he was positioning was still

1. There was no evidence that any of the parties to this appeal were responsible for the unavaila-

bility for testing of the items delivered to the Harvester Safety Department.

hooked to the hoist. Under such tension, the hoist was jerked loose from the casting, and Plaintiff was struck by the hook.

Witness Cobble testified that he was a Harvester employee at the time of the accident and had been for approximately ten years. He was in charge of the safety crib, from which safety supplies, including safety glasses were supplied to the workers. When safety glasses came to the crib, printed warnings were affixed to them, but they were removed prior to delivering the glasses to the workers. Such warnings advised that the lenses were impact resistant but not unbreakable and that pitted or scratched lenses were unsafe and should be replaced. The witnesses had seen broken lenses in the factory previously and had broken some with a hammer in demonstrations for workmen. OSHA regulations required that safety lenses for industrial use be between 3.1 mm. and 3.8 mm. thick.

Witness Gross testified that he was the laboratory manager of Longe Optical Company, a manufacturer of safety lenses and was qualified as an expert in that field. He explained the procedures employed in manufacturing and testing safety glasses. Lenses are rendered impact resistant by heating and cooling them, but no lens is unbreakable or shatter proof. OSHA approves a thickness of 3.0 mm. to 3.8 mm. for industrial lenses. All heat treatment processes work on the same principle, and lenses must be subjected to an impact test which consists of dropping a steel ball 1⅛″ in diameter and weighing 2.4 ounces onto the lens from a height of fifty inches. These are national standards used "everywhere by everybody."

Plastic safety lenses are slightly more resilient than glass lenses, but OSHA standards do not distinguish between the two. Safety lenses of whatever type are not intended to protect the wearer from all forces, regardless of the magnitude. They can only be made so strong, and if the National Standards are met that is all that can be done.

The witness examined some of the glass particles removed from Plaintiff's eye but had no pieces large enough to be tested for heat treatment with their equipment. Such particles could probably be tested with more sophisticated equipment.

Plaintiff testified that the accident occurred while he was at work at the lathe, but he did not know what phase of the cutting cycle he was in. He was hit only once. He did not know what hit him but said that it could have been the object he was placing into or removing from the lathe. He was knocked to the floor, but he had no facial injuries or bruises. He was wearing plastic framed safety glasses with the American insignia on the frames, which he had purchased from the Harvester safety crib, when the accident occurred. He had purchased at least four or five pairs of such glasses from the crib between June of 1969 and September 26, 1972, the date of the accident. He knew that scratched or pitted lenses could be replaced at no cost to him, but he could not remember whether or not he had exchanged any prior to the accident.

Plaintiff believed that the safety glasses were unbreakable, "within the job, * * *"

"Q. You thought that they were unbreakable under any circumstances?

"A. I don't believe they would stand a bullet or things like this, but within the job, well, like I said there was no warning, there was nobody said watch out, you got to be careful, this was never said."

Plaintiff acknowledged having signed Harvester's Exhibit "B" two and one-half weeks after the accident, it having been identified and admitted by stipulation during Harvester's cross-examination of him. He denied having made the statement therein attributed to him or having read the document, however, and stated that it had been prepared by Harvester prior to his arrival at its office, and that he signed it at Harvester's request. Exhibit "B" was a copy of an Industrial Board Form No. 12 "Agreement Between Employee and Employer As to Compensation" and contained the following statement as to how the acci-

dent had occurred. "Employee positioned a differential carrier in a lathe with a hoist. As he reached to engage the chuck, he hit the spindle jog button causing the spindle to revolve which in turn jerked the hoist hook loose. The hook struck him in the right eye."

Plaintiff also acknowledged having signed Harvester's Exhibit "A", also admitted by stipulation during cross-examination of Plaintiff. It was an Industrial Board Form 9, "Application of Injured Employee * * * Claim For Compensation," prepared by and sworn to before his own attorney, Mr. Colvin, on June 21, 1974, one year and nine months after the accident occurred and three months prior to the filing of the complaint in this cause. In that application, Plaintiff represented, under oath, that the accident occurred "while operating a lathe machine when he was injured by a steel bar, 3 feet long and 1 inch in diameter struck right lens of safety glasses, shattering lens * * *."

Plaintiff's Exhibit No. 4 was admitted ancillary to the deposition of James A. Bixler, the ophthalmologist who performed surgery upon Plaintiff's eye following the injury. The exhibit is a copy of the report of the physician who had attended Plaintiff in the hospital emergency room to which he had been taken directly from the Harvester dispensary and contains the following statement: "States a hoist hit him in the eye."

Upon the issue of how the accident happened, the evidence is without conflict and leads to but one conclusion, i.e., the safety glass lens broke when it was struck a severe blow by hook or steel bar, components of an electrically operated hoist used for conveying the ninety pound differential carriers from a position behind Plaintiff, up, overhead and down onto the lathe cradle. The hoist component was hurled against the lens when the spinning of the differential carrier was activated while it was still secured to the hoist, which caused it to break loose under the strain.

"As a general rule, a party vouches for the credibility of the evidence and witnesses he presents, and such evidence, if adverse, is binding on him unless contradicted by other evidence." 32A C.J.S. Evidence § 1040(1).

The Plaintiff offered no evidence to contradict the above related testimony and circumstantial evidence presented by his own witnesses and by himself, none of which conflicted with his own prior statements as to how the accident had occurred. His testimony that he did not know how the accident happened may, with difficulty, be taken as true, but it does not contradict the evidence recited; and although he testified, at one point, on redirect examination, that it could not have happened that way, from his demonstration and testimony it is clear that he was not disputing the nature of the mishap but only that he had caused it by prematurely activating the lathe spindle. It is immaterial how the lathe was activated, since it cannot be attributed to American or U.S.

Neither was Plaintiff's evidence, that National Standards for industrial safety glasses do not anticipate that the wearer be protected from all forces and only require that lenses withstand the force of a 2.4 ounce steel ball, $1\frac{1}{8}"$ in diameter dropped from a height of fifty inches, contradicted. It, too, permits but one conclusion, that being that safety glasses cannot reasonably be expected to withstand any and all forces that might occur in an industrial plant such as Plaintiff's work place. The evidence of one of the defendants revealed that the force of the hook or bar that struck Plaintiff's lens was equal to that created by a drop of the aforementioned steel ball from a height of 241 feet, or by a drop of a five pound sledge hammer from seven feet or a ten pound sledge hammer from three and one-half feet. We hasten to add that this evidence does not influence our decision. The jury was not bound by it, even though it was unrefuted. But this is not a res ipsa loquitur case. It was incumbent upon Plaintiff to come forth with some substantial evidence of probative value that the lens was defective, which, under the circumstances could be

done only by evidence that the force that broke his lens was one that it could reasonably have been expected to withstand. This he failed to do.

Our Court of Appeals determined that there was substantial evidence presented that the glasses were *defective:* "We base this conclusion, after a review of the evidence on our determination that the warning itself, if in fact one was given, was the defect in the product." We disagree with that court's entire analysis in this regard, but our resolution does not require us to determine whether or not a warning was given and if so, whether or not it was adequate. Neither does it require us to determine the effect upon the case of the removal, through no fault of a manufacturer, of a warning of debatable adequacy which it had placed upon its product. It does seem to us that it requires speculation beyond lawful limits to say that had the warning been in place when the product was delivered to the consumer, it would, nevertheless, have been to no avail, because it was printed in type much smaller than the trade name and promotional matter printed upon the box which contained it.

■ The threshold question with respect to a manufacturer's liability for damages allegedly sustained as a result of its failure to give a warning is whether or not there was a duty to warn.

■ The basic rules with respect to a manufacturer's duty to give warnings, as summarized by the Restatement of Torts and as applicable to the case before us, rendered the manufacturer of the lens in question liable to Plaintiff if it (a) knew or had reason to know that the lenses were likely to be dangerous when used in the manner employed by Plaintiff, (2) had no reason to believe that Plaintiff would realize that dangerous condition, and (3) failed to exercise reasonable care to inform Plaintiff of such dangerous condition. *Restatement, Second, Torts* § 388.

"[T]here is no duty to warn just because a product might conceivably cause injury." *63 Am.Jur.2d 53, Products Liability § 42.*

"Moreover, because the duty to warn has its genesis in a condition of danger, there is no such duty with respect to a product which is, as a matter of fact, not dangerous.

\* \* \* \* \* \*

"It has also been said that it would be totally unreasonable to require that a manufacturer warn against every injury which might ensue from mishap in the use of its product, \* \* \*." *Id.* p. 59, § 50.

There is also authority to the effect that there is no duty to warn where there is only a remote possibility of danger from the use of the product in question. *Bish v. Employers Liability Assur. Corp.,* 236 F.2d 62 (5th Cir.1956); *Pontifex v. Sears, Roebuck & Co.,* 226 F.2d 909 (4th Cir.1955).

■ Absent proof of a dangerous instrumentality, or proof of a defect or improper design making an otherwise harmless instrument dangerous, there is no duty to warn of product connected dangers. *McMeekin v. Gimble Bros., Inc.,* 223 F.Supp. 896 (D.C.Pa.1963).

In *Jamieson v. Woodward & Lothrop,* (1957) 101 U.S.App.D.C. 32, 247 F.2d 23, *cert. den.* 355 U.S. 855, 78 S.Ct. 84, 2 L.Ed.2d 63, it was said that although a hammer, not of defective design, may hurt the user if it slips, and the manufacturer cannot manufacture a knife that will not cut, or a stove that will not burn a finger, the law does not require him to warn of such common dangers; although it is unlikely that any book of instructions given with a car warns that, if a user accidentally steps on the accelerator instead of the brake, he may be hurt, nevertheless no case has yet held the manufacturer liable under such circumstances; and although a lead pencil can stab a man or puncture his jugular vein, the manufacturer thereof is not liable to one who accidentally slips and falls on a pencil point in his pocket, the manufacturer having no duty to issue a warning with the sale of the pencil.

The key words that run throughout the numerous opinions that have been written upon the duty to warn are "dangerous" and "unreasonably dangerous." If it can be said that the safety glasses worn by Plaintiff were dangerous, it can only be by virtue of their being worn, as intended, in close proximity to the eyes. The risk of injury from the breaking of the lens through some fortuitous event is obvious to all. The manufacturer, therefore, had every reason to believe that the user of the glasses would recognize that very limited danger, and condition (b) of the above quoted rule from the Restatement was not present.

"It is well established that there is no duty resting upon a manufacturer or seller to warn of a product-connected danger which is obvious or generally known, * * *. *The same rule applies where it appears that the person using the product should know of the danger, * * *.*" (Emphasis added) *63 Am.Jur.2d 60, Products Liability § 51.*

In *Hensley v. Muskin Corp.,* (1975) 65 Mich.App. 662, 238 N.W.2d 362, it was held that the manufacturer of a four foot deep backyard swimming pool had no duty to warn a 28 year old plaintiff of the obvious danger of diving off a seven foot high roof into the pool. And in *Vance v. Miller-Taylor Shoe Co.,* (1978) 147 Ga.App. 812, 251 S.E.2d 52 it was held that there was no duty to warn the purchaser of shoes of the obviously common danger that a wedge shaped metal plate inserted in the heel could make the heel slippery and cause him to fall.

There was no evidence to support a claim that Plaintiff's injury was caused by a defective product. Neither was there any evidence from which it could be found that a duty was owing to him from the manufacturer to warn of dangers inherent in its being broken by a fortuitous occurrence while being used in the manner for which it was intended. Rather, all of the evidence leads to one and to only one conclusion, that being that the injury was caused by a force which far exceeded that

which the lens had either been designed to withstand or could reasonably be expected to withstand by the ordinary consumer who would be expected to use it. Accordingly, there was no evidence to support a judgment for the Plaintiff upon strict liability or negligence doctrines.

There was no evidence presented of any express warranty having been made by the manufacturer of the lens, nor was there any evidence presented from which there could be found any implied warranty that the safety glasses would protect the Plaintiff from danger in the event of an accident of the nature of the one that caused his injury.

Accordingly, the trial court erred when it denied the motions of American and U.S. for judgments on the evidence at the close of all the evidence. The judgment is reversed, and the cause is remanded to the trial court with instructions to sustain said motions.

GIVAN, C.J., and PIVARNIK, J., concur.

DeBRULER, J., concurs in result with opinion in which HUNTER, J., concurs.

### ON PETITION TO TRANSFER

DeBRULER, Justice, concurring in result.

Safety devices, such as safety glasses, are designed to shield and protect the user, the workmen in the plant in this case, from perceived hazards. I take it as plain truth that the protection provided by such devices is limited in nature. The user of safety devices therefore needs to know these limitations in real and practical terms, so as to arm the user not to rely upon them for protection in inappropriate circumstances, and thereby suffer injury. The manufacturer who designs and produces such devices has this information, and must be charged with knowing of this inherent danger. There must therefore arise a legal duty of a manufacturer of safety devices to supply adequate warnings with them.

In this case, the manufacturer placed these glasses into the stream of commerce with warnings attached. The tool crib man at the plant, stripped the warning tags and stickers off before selling them to employees. That act had to occur before the glasses could be used. That act in this case by an intervenor however caused the glasses to reach the ultimate user in defective form, i.e., without necessary warning tags and stickers. I would point out here particularly the one which stated that scratches on the lens reduced protection. In my judgment, as a consequence of the detachment, there was insufficient evidence that the glasses were defective because of inadequate warnings by the manufacturer. I therefore concur in the result reached by the Court's majority.

HUNTER, J., concurs.