

IN THE

# Indiana Supreme Court

Supreme Court Case No. 24S-CT-159

## Christine Cosme and Roy Cosme,
*Appellants,*



FILED
May 06 2024, 3:22 pm
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

–v–

## Debora A. Warfield Clark, Dan Churilla d/b/a Churilla Insurance, and Erie Insurance Exchange,
*Appellees.*

---

Argued: December 14, 2023 | Decided: May 6, 2024

Appeal from the Lake Superior Court Civil Division Room One
No. 45D01-1803-CT-39
The Honorable John M. Sedia, Judge

On Petition to Transfer from the Indiana Court of Appeals
No. 22A-CT-1897

---

**Opinion by Justice Slaughter**

Chief Justice Rush and Justices Massa, Goff, and Molter concur.

**Slaughter, Justice.**

After a plaintiff rests his case, the trial court may enter a directed verdict (or judgment on the evidence) against him if there is insufficient evidence on any element of his prima facie case. We reaffirmed this standard in *Purcell v. Old National Bank*, 972 N.E.2d 835 (Ind. 2012). There, we held a trial court may review evidence both quantitatively and qualitatively. But this standard left open a question we must resolve today—whether a court may take on the jury's fact-finding role to weigh evidence and assess witness credibility at the close of the plaintiff's case. We hold that at the directed-verdict stage, the court can review whether inferences from the evidence are reasonable, but it cannot weigh conflicting evidence or assess witness credibility. To do otherwise would deprive the plaintiff of his constitutional right to a jury trial. Applying this standard here, we hold the trial court erred in directing the verdict for defendant Erie Insurance Exchange, but we affirm the directed verdict for defendant Churilla Insurance.

I

A

This case arises from an insurance claim filed after the insurer cancelled an insurance policy. The plaintiffs, Christine and Roy Cosme, had an automobile insurance policy with Erie Insurance Exchange. The policy listed their son, Broyce Cosme, as a driver. The Cosmes' troubles began with a misunderstanding between Broyce and the Indiana Bureau of Motor Vehicles.

In February 2017, Broyce, who was 19 years old at the time, was a passenger in his friend's car when Hobart police pulled them over. Broyce and his friends were arrested for possessing marijuana. After the arrest, BMV records showed mistakenly that Broyce was the driver and that he did not provide proof the car was insured. Based on this mistake, the BMV suspended Broyce's license. Upon learning of the suspension, Broyce contacted both the BMV and the officer, Kevin Garber, who wrote the police report. Garber assured Broyce "he would fix it". But Garber did not "fix it", and Broyce's license remained suspended.

In August 2017, the Cosmes' insurance policy automatically renewed for another year. While doing a routine motor-vehicle-report search for underwriting, Erie discovered Broyce's suspended license. On September 27, Erie sent a letter to the Cosmes stating that, because Broyce's license was suspended, it would cancel their insurance policy unless it could exclude coverage for Broyce. The letter explained the policy would cancel effective November 1, 2017, unless the Cosmes submitted a coverage-exclusion form removing Broyce from the policy by October 28.

After receiving the letter, Roy waited until October 26 to call Erie. When he called, Erie directed his call to Janine Aguilar, an insurance agent at Churilla Insurance. Aguilar and Roy gave different accounts of this phone call at trial. According to Aguilar, after Roy explained the mistaken license suspension, she advised Roy still to sign the exclusion form to remove Broyce from the policy and have Broyce reinstated later. But Roy rejected this advice. Instead, he said he would have Broyce send paperwork to Aguilar showing the suspension was a mistake.

Roy agrees that Aguilar mentioned signing the exclusion form. But he says he told Aguilar that if Broyce got his license reinstated, they "could just have this fixed" without taking Broyce off the insurance. He says Aguilar did not tell him he needed to sign the exclusion form or he would lose the insurance even if Broyce's license were reinstated. If she had, Roy says he would have signed the form. According to Roy, Aguilar also did not mention the possibility of Roy getting other insurance for the family, including for Broyce.

After her phone call with Roy, Aguilar emailed and called Megan Malena, an underwriter at Erie, to ask her not to cancel the Cosmes' policy since Broyce's suspension was a mistake. Malena responded that the underwriting system still showed a license suspension, and the only way to maintain coverage for Christine and Roy was to remove Broyce from the policy. Aguilar and Roy spoke the next day, and Aguilar asked Broyce to provide his reinstatement papers. Roy says Aguilar did not mention signing the exclusion form or obtaining other insurance.

The Cosmes did not submit the exclusion form before Erie's October 28 deadline. But the BMV reinstated Broyce's license on October 28 after

Broyce paid a fee. After at first sending the reinstatement papers to the wrong email address, Broyce emailed Aguilar a receipt on October 30 showing he paid to have his license reinstated. Aguilar confirmed receipt. This confirmation gave Roy the impression that the issue on the policy was resolved. And because Aguilar was still working with him past the October 28 deadline, Roy thought the deadline no longer mattered because he was doing what the agent had told him to do.

On October 31, Malena told Aguilar that Erie could cancel despite the reinstatement of Broyce's license because Erie can cancel a policy midterm if a listed insured has a suspended license at any time during the policy period. Thus, the only way Roy could maintain coverage for his family was to submit the exclusion form by midnight that day. Aguilar admits she knew this before receiving Malena's email. Aguilar left a voicemail for Roy and Broyce on October 31 and sent an email to Broyce communicating this information. Neither discovered the voicemails or email until several days after Erie's November cancellation date. According to Roy, Aguilar's voicemail was the first time she told him he needed to sign the exclusion form or the policy would be cancelled regardless of Broyce's reinstatement.

As threatened, Erie cancelled the Cosmes' policy on November 1. Three days later, an uninsured motorist, Deborah A. Warfield Clark, rear-ended Roy and Christine. Roy and Christine did not receive notice that Erie had cancelled their policy until November 6. Until then Roy "assumed we're good" because Broyce sent Aguilar the reinstatement papers, and they had heard nothing in return. After discovering the policy cancellation, Roy sent an email to Aguilar explaining that he "was under the impression from [Aguilar] in [their] conversations that if he had [Broyce's] drivers license reinstated the insurance coverage for all [Roy's] vehicles would continue as it always ha[d]." He also wrote:

> if Broyce needed to be removed from my automobile insurance coverage policy[,] no matter what[,] why wasn't that stated to me instead of you telling me you were taking it to the underwriter to have it checked if Broyce's license was

reinstated. Why would you do that? What was the point of
that?

Once the Cosmes discovered the policy was cancelled, they submitted the
exclusion form and got the policy reinstated. On November 13, the trial
court in a separate matter ordered the BMV to expunge Broyce's license
suspension from its record—as if the suspension never happened. The
Cosmes submitted the November 4 accident as a claim, but Erie denied
coverage because their policy was no longer in effect on that date.

B

After Erie denied the claim, the Cosmes sued Clark, Erie, and Churilla.
Against Clark, they brought a negligence claim for causing the accident.
The claim against her is not before us. Against Erie and Churilla, the
Cosmes alleged breach of contract and sought punitive damages, and they
requested declaratory relief that Erie and Churilla breached contractual
and common-law duties owed them under the insurance policy. And
against Erie alone, they brought a bad-faith claim, alleging Erie breached
its duty to deal with the Cosmes in good faith.

In his opening statement at trial, Churilla's counsel referenced the
initial phone conversation between Roy and Aguilar. He explained that
"what exactly was said" is "going to be a matter of dispute." The jury, as
factfinder, is "just going to have to listen to the testimony, examine the
documentary evidence, and decide what happened." The Cosmes then
presented their case-in-chief, including testimony from Roy, Christine,
Broyce, Aguilar, Malena, and their expert, Elliott Flood. The Cosmes also
presented documentary evidence, including the certified insurance policy,
emails between Roy and Aguilar, emails between Aguilar and Malena,
and the letters Erie sent to Roy.

Relevant to our review here, the Cosmes presented various evidence on
the insurance policy's effective dates. The Cosmes presented a letter from
Julia Swanson, who worked at Erie, to Erie's counsel. In this letter,
Swanson certified that "from August 27, 2017 to August 27, 2018"—
notably including the November 4, 2017 accident date—"the enclosed
Declarations, policy form and endorsements were in effect . . . unless

otherwise modified or cancelled in the future." But also in evidence was Swanson's affidavit stating that her certification included a scrivener's error about the date and should have said August 27, 2017, to November 1, 2017. The Cosmes' expert, Elliott Flood, an insurance consultant and a former insurance executive, testified that Swanson's certification suggested the November 4 accident was covered under the policy. Flood explained that Swanson's certification was "under oath", and she had "been trained . . . to be careful to make sure you get the official record". While he acknowledged that Swanson claimed the certification was a mistake, Flood viewed this mistake as a "big red flag" because it made it unclear whether the policy was in effect at the time of the accident.

After the Cosmes rested their case, Erie and Churilla moved for judgment on the evidence. Clark never appeared at trial and thus did not make a similar motion. The trial court granted the motion, reasoning that the Cosmes brought about their own lack-of-coverage injuries when they failed to sign the exclusion form before October 28. The court denied the Cosmes' motion to correct error. The Cosmes then appealed, challenging the order granting the motions for judgment on the evidence but not the order denying their motion to correct error.

The court of appeals affirmed, holding the Cosmes failed to present sufficient evidence to support their claims against Erie and Churilla. *Cosme v. Warfield Clark*, No. 22A-CT-1897, at *3 (Ind. Ct. App. Mar. 8, 2023) (mem.). On the professional-negligence claim against Churilla, the appellate panel found that if Churilla owed the Cosmes a duty, Churilla met its duty of reasonable care by telling the Cosmes to sign the exclusion form and attempting to persuade Erie not to cancel the policy. *Id.* at *14–15. On the breach-of-contract claim against Erie, the panel found "the evidence relating to cancellation overwhelmingly and entirely establishes" that the policy was cancelled because the Cosmes failed to submit the exclusion form. *Id.* at *18. "As such, it cannot be said that the Cosmes' intended inference, i.e., that the Policy was in effect at the time of the Accident, can logically be made from the evidence presented during their case-in-chief." *Id.* at *18–19. On the bad-faith claim, the panel found that because there was no contract in place between Erie and the Cosmes when Clark rear-ended Christine and Roy, "Erie could not have been found to

have breached its duty" when it denied the Cosmes' insurance claim. *Id.* at *20. And Erie did not cancel the policy in bad faith, the panel found, because Broyce's license was suspended when Erie cancelled the policy. *Id.* at *20–21. Because all claims against Churilla and Erie failed, the punitive-damages claim, which was derivative of the other claims, also failed. *Id.* at *21–23.

The Cosmes then sought transfer, which we now grant, thus vacating the appellate opinion, Ind. Appellate Rule 58(A).

## II

Under Trial Rule 50(A), a movant may seek judgment on the evidence at the close of a plaintiff's case if all or some of the issues are "not supported by sufficient evidence". Ind. Trial Rule 50(A). In *Purcell v. Old National Bank*, we reaffirmed this standard for Rule 50(A) motions. 972 N.E.2d at 839. But *Purcell* left it unclear whether a court may weigh evidence or assess witness credibility in deciding whether "sufficient evidence" supports an issue. Today, we answer that question in the negative. When ruling on a Rule 50(A) motion, a judge may assess both the quantity and quality of the evidence presented by the nonmovant but may not weigh the conflicting evidence or assess witness credibility; these are fact-finding functions within the jury's sole province.

Here, we hold that the trial court erred in granting judgment on the evidence to Erie because the Cosmes' case-in-chief presented sufficient (though conflicting) evidence to prove Erie breached its contract and violated its duty of good faith. But the court correctly granted judgment to Churilla because the evidence showed Churilla owed no special duty to the Cosmes to procure insurance or advise on the insurance policy.

## A

Under *Purcell*, we analyze Rule 50(A) motions both quantitatively and qualitatively. Evidence fails quantitatively if no evidence supports finding for the nonmovant (the any-evidence standard). *Id*. at 840. Evidence fails qualitatively if the probative evidence cannot create a reasonable inference that a jury could find for the nonmovant (the substantial-evidence standard). *Ibid.* A nonmovant—usually a plaintiff—may fail the

qualitative prong "either because of an absence of credibility of a witness or because the intended inference may not be drawn therefrom without undue speculation." *Ibid.* (quoting *Am. Optical Co. v. Weidenhamer*, 457 N.E.2d 181, 184 (Ind. 1983)). When evaluating the evidence, the court must look at the evidence in the light most favorable to the nonmovant. *Id.* at 839.

On this point, *Purcell* is inconsistent in both promoting and simultaneously disavowing courts that would assess witness credibility and weigh evidence at the directed-verdict stage. The qualitative prong expressly permits the court to assess "an absence of credibility of a witness". *Id.* at 840 (quoting *Am. Optical Co.*, 457 N.E.2d at 184). It also implicitly permits the court to weigh evidence. The qualitative prong asks "not merely whether a conflict of evidence may exist, but rather whether there exists probative evidence, substantial enough to create a reasonable inference that the non-movant has met his burden." *Id.* at 841. This suggests that a conflict of evidence would not defeat a directed-verdict motion and that a court must assess both the "probative" value of evidence and whether that evidence is "substantial". *Ibid.*

In practice, *Purcell*'s analysis allows courts to weigh some of the evidence. There, we found a generalized, ambiguous interrogatory response insufficient to link the defendant to the alleged fraud. *Id.* at 841–42. We also considered the conflicting evidence—testimony explaining the interrogatory response during trial that suggested the defendant was not tied to the fraud. *Ibid.* Thus, along with looking at the quality of the nonmovant's evidence (what could be reasonably inferred from the evidence most favorable to the nonmovant), we also weighed the conflicting evidence not favorable to the nonmovant and found "as a whole" the evidence could not defeat the directed verdict. *Id.* at 841.

While permitting courts to assess witness credibility and weigh evidence in the qualitative prong, *Purcell* simultaneously instructs courts to refrain from either function: "It remains true that a court is not free to engage in the fact-finder's function of weighing evidence or judging the credibility of witnesses to grant judgment on the evidence, where fair-minded men may reasonably come to competing conclusions." *Id.* at 842.

Indeed, *Purcell* says, this function "has always been within the purview of the jury." *Ibid.*

Given *Purcell*'s contradictory commands, we clarify that courts may not weigh evidence or assess witness credibility—fact-finding functions reserved for the jury—at the close of plaintiff's case-in-chief. This is why, historically, we have cautioned courts not to deprive juries of this role by granting directed verdicts. See, e.g., *Whitaker v. Borntrager*, 122 N.E.2d 734, 734–35 (Ind. 1954). This approach also aligns with our summary-judgment standard, which allows even a self-serving affidavit to defeat summary judgment so a case can go to trial. *Hughley v. State*, 15 N.E.3d 1000, 1004 (Ind. 2014). Only after both sides have rested and the jury returns its verdict do we permit the trial judge to take a more substantive role in assessing the evidence as a so-called thirteenth juror, empowering the court to conclude that no reasonable jury could have reached the result it did. *Chi Yun Ho v. Frye*, 880 N.E.2d 1192, 1196 (Ind. 2008). At the post-verdict stage, the court is not impeding the jury-trial right. And directing judgment after a jury verdict has a lower effect on judicial resources. If a trial court sets aside a jury verdict erroneously, the appellate court can reinstate the verdict. But if there is no jury verdict, the only suitable appellate remedy is a new trial.

1

The core reason we bar weighing evidence and assessing witness credibility at the directed-verdict stage is because our legal system reserves the fact-finding function to juries. Our state constitution expressly protects the jury-trial right in civil cases. And our historical treatment of directed verdicts shows a reticence to remove any factual issues from the jury supported by sufficient evidence to permit a reasonable jury to return a verdict for the plaintiff.

The Indiana constitution protects "the right of trial by jury" in all civil cases. Ind. Const. art. 1, § 20. "The jury are the exclusive judges of the evidence." *Rannells v. State*, 18 Ind. 255, 257 (1862). Thus, parties have a "constitutional right . . . to have a jury determine the credibility of the witnesses and the weight that shall be given the evidence and to decide

the facts accordingly." *Novak v. Chicago & Calumet Dist. Transit Co.*, 135 N.E.2d 1, 5 (Ind. 1956).

A directed verdict withdraws an issue from the jury and hands it to the judge. But to maintain the jury-trial right, we cannot permit the court to preempt the jury's fact-finding function. We said as much in *Purcell*: "Our decision does not alter the critical, invaluable, and constitutionally protected role of the jury in Indiana's system of jurisprudence. It remains true that a court is not free to engage in the fact-finder's function of weighing evidence or judging the credibility of witnesses". 972 N.E.2d at 842.

Our precedent protects the jury's function in civil cases. The first hint of permitting courts to qualitatively review evidence and witness credibility on directed verdicts was not until 1983 in *American Optical*, 457 N.E.2d at 184. Before *American Optical*, we followed the any-evidence rule and did not permit a directed verdict if any evidence or legitimate inference supported each material allegation of the nonmovant's claim. *Whitaker*, 122 N.E.2d at 734–35. Under this rule, a court should not direct a verdict unless "there is a total absence of evidence or legitimate inference in favor of the plaintiff upon an essential issue; or where the evidence is without conflict and is susceptible of but one inference" for the movant. *Ibid.* "[T]he court will not weigh the conflicting evidence or inferences but will consider only the evidence and inferences that are most favorable to the [nonmovant]." *Id.* at 735. We embraced this rule to preserve the jury-trial right, *Novak*, 135 N.E.2d at 5, and reaffirm it today.

In line with our historical approach, we hold that *Purcell*'s qualitative prong limits the court to reviewing only the reasonableness of inferences drawn from evidence. See *Whitaker*, 122 N.E.2d at 735 (holding courts view "all inferences which the jury might reasonably draw" on a directed-verdict motion). Thus, the court cannot ignore direct evidence, but it can assess whether proposed inferences to be drawn from circumstantial evidence are reasonable or speculative. See *ibid.* Still, the court cannot substitute its own view of the evidence for that of the jury since this prerogative is solely the jury's. See *Novak*, 135 N.E.2d at 5. A court views the evidence with all reasonable inferences for the nonmovant, and the

court cannot assess witness credibility or weigh conflicting evidence (or the conflicting inferences drawn from it). *Whitaker*, 122 N.E.2d at 735.

In sum, under our current standard, we permit courts to ensure the inferences supporting the nonmovant's claims are reasonable, but courts cannot take on the jury's fact-finding functions of weighing conflicting evidence and assessing witness credibility.

2

Limiting courts this way with directed verdicts aligns with our approach in Rule 56 summary-judgment motions. Summary judgment is appropriate when there is no disputed issue of material fact, and the moving party is entitled to a judgment as a matter of law. T.R. 56(C); *Griffin v. Menard, Inc.*, 175 N.E.3d 811, 813 (Ind. 2021). On summary judgment, we draw all reasonable inferences for the nonmovant. *Griffin*, 175 N.E.3d at 813. But "the non-moving party must designate some evidence to defeat the moving parties' motion", and "speculation is not enough to overcome summary judgment." *Id.* at 814.

While Rule 50(A) and Rule 56 motions occur at different stages of the litigation, both have the same goal—withdrawing issues from the jury when there are no factual issues for the jury to decide. Summary judgment is available when the nonmovant **cannot prove** its claim based on the undisputed evidence. Judgment on the evidence (directed verdict) is available when the nonmovant **has not proved** its claim because no reasonable jury could find for it. Thus, just as a self-serving affidavit can defeat summary judgment, *Hughley*, 15 N.E.3d at 1004, so too can the same self-serving trial testimony defeat a directed verdict.

Consistent with Indiana's approach, federal courts likewise apply parallel standards on summary judgment and judgment on the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986). "In essence, though, the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. Again, the primary difference between the summary-judgment and

directed-verdict standards is procedural—the former is made on evidence adduced before trial, and the latter on evidence admitted at trial. *Id.* at 251.

Given the two motions' similar functions, it makes little sense to let a case go to trial on some quantum of evidence but not to a jury. Evidence that creates a factual dispute requiring a trial should also require a jury to resolve that dispute. It would be paradoxical for courts to let a case proceed to trial based on certain evidence but once at trial to withdraw the case from the jury based on the same evidence.

3

While a trial court has no fact-finding role under Rule 50(A), the court may take a more active role after the jury has returned a verdict, or after the court has entered judgment. On a motion to correct error under Rule 59(J), a trial court shall grant a new trial if the jury's verdict "is against the weight of the evidence". T.R. 59(J)(7). And the court shall enter judgment notwithstanding the jury's verdict if the verdict "is clearly erroneous as contrary to or not supported by the evidence". *Ibid.* On a Rule 59(J) motion, the judge acts as the "thirteenth juror" and must "sift and weigh the evidence and judge witness credibility." *Chi Yun Ho*, 880 N.E.2d at 1196 (quoting *Keith v. Mendus*, 661 N.E.2d 26, 31 (Ind. Ct. App. 1996)).

One reason we permit a more active role for the trial court **after** the jury has entered its verdict is because, on appeal, if the appellate court disagrees with the trial judge's ruling under Rule 59(J), it can reinstate the jury's verdict. At that stage, there is a verdict to reinstate. But on directed verdict, an appellate reversal requires a new trial before a different jury because the first jury never got to render a verdict—an unwise, inefficient use of judicial resources. An appellate court also can better review the merits of how a trial court weighed evidence at the Rule 59(J) stage because the court must detail its reasoning in a written order. When ordering a new trial, the trial court must both "specify the general reasons" for its ruling and "make special findings of fact upon each material issue or element of the claim". T.R. 59(J). Rule 50(A) does not impose the same requirements.

The trial court does not circumvent the jury-trial right at the Rule 59(J) stage. At this stage, the jury has already heard the evidence and returned its verdict. If the trial court orders a new trial, it hands the case to another jury rather than just taking the case from the jury. See *Weida v. Kegarise*, 849 N.E.2d 1147, 1151 (Ind. 2006). The court enters judgment notwithstanding the verdict only when the verdict is "clearly erroneous", T.R. 59(J), which asks if any facts support the verdict, see *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997) (applying clear-error review to trial-court judgment on appeal). And the court cannot enter judgment if "such relief is shown to be impracticable or unfair to any of the parties or is otherwise improper". T.R. 59(J). As we explained in *Novak*, this motion protects the parties' jury-trial right and protects the defendant from a significant error by the jury:

> Thus it is that a complaining party, whose case is supported by some evidence of probative value upon every material issue, is given the benefit of his constitutional guarantee to have the right which he asserts finally affirmed or denied by a qualified and impartial jury. Thus also it is that a party-defendant is protected against the errors of a jury by the trial judge, whose duty it is to review the entire proceedings in the cause, and, in the light of his greater experience and understanding of the law, either affirm or reject the verdict of the jury.

135 N.E.2d at 5. Defendants concerned during trial about receiving an unfair or erroneous jury verdict must wait to file a post-judgment Rule 59(J) motion to receive a judge's more holistic, qualitative analysis that considers and weighs all the evidence the jury heard.

B

Next, we apply our directed-verdict test to the Cosmes' claims. But before reaching the merits, we must first set out the standard of appellate review.

Our precedent has been unclear about what standard of review applies. On one hand, we have said the reviewing court applies "the same

standard that the trial court uses", *Purcell*, 972 N.E.2d at 839, which is de novo review. But we have also said that "the trial judge is within his or her discretion to issue judgment on the evidence", *id.* at 842, which is an abuse-of-discretion standard. We resolve the uncertainty by observing that because trial courts do not weigh evidence or assess witness credibility on directed verdicts, we must apply de novo review. The paper record alone is enough for a reviewing court to assess whether, without any weighing, the evidence supports any reasonable inference in favor of the nonmovant. This standard of review aligns with our summary-judgment standard of review, *Griffin*, 175 N.E.3d at 812–13, and with the federal approach, *Simstad v. Scheub*, 816 F.3d 893, 900 (7th Cir. 2016).

Turning to the merits, without assessing witness credibility or weighing evidence, we hold that sufficient evidence supports the Cosmes' claims for breach of contract and bad faith against Erie. Based on the Cosmes' evidence, a reasonable jury could find that the insurance policy was in effect when Clark rear-ended Christine and Roy on November 4, 2017. A jury could also find that Erie dealt with the Cosmes in bad faith when communicating about the policy cancellation and when it ultimately denied their insurance claim. Because a reasonable jury could find bad faith, it could also award punitive damages against Erie. But insufficient evidence supports the Cosmes' professional-negligence claim against Churilla because no reasonable jury could find Churilla owed the Cosmes a special duty.

1

As for the claims against Erie, the Cosmes presented conflicting evidence to support their breach-of-contract and bad-faith claims. We look only to the evidence supporting the Cosmes' claims, with all reasonable inferences in their favor, to assess whether a reasonable jury could find for them on all elements of their two claims. Though conflicting, the Cosmes' evidence on both claims—one sounding in contract, the other in tort—is enough to defeat a directed verdict. "[A]n insured who believes that an insurance claim has been wrongly denied may have available two distinct legal theories, one in contract and one in tort". *Erie Ins. v. Hickman ex rel. Smith*, 622 N.E.2d 515, 520 (Ind. 1993). The breach-of-contract claim

requires that a contract be in place at the time of the breach. *Collins v. McKinney*, 871 N.E.2d 363, 370 (Ind. Ct. App. 2007). Whether a policy was cancelled, making the contract no longer in effect, is the insurer's burden to prove. See *Am. Fam. Ins. v. Ford*, 293 N.E.2d 524, 526 (Ind. Ct. App. 1973). A related tort claim arises from an insurer's duty to deal with its insured in good faith. *Erie Ins.,* 622 N.E.2d at 518–19. This duty encompasses more than a coverage claim. *Monroe Guar. Ins. v. Magwerks Corp.*, 829 N.E.2d 968, 976 (Ind. 2005). We recognize four specific duties that insurers owe insureds: (1) refrain from unfounded refusal to pay policy proceeds; (2) refrain from unfounded delay in payment; (3) avoid deceiving the insured; and (4) avoid exercising any unfair advantage to pressure the insured into settling a claim. *Ibid.*

Erie argues there was no bad faith and no breach of contract because the policy was not in effect when Clark rear-ended the Cosmes. But the Cosmes' evidence suggests the policy was in place at the time of the accident. An affidavit from Swanson, the Erie employee, certified that the policy was in effect at the time of the accident in November 2017—"from August 27, 2017 to August 27, 2018". The Cosmes' expert repeatedly claimed that the certification was a valid basis to think the policy was in force at the time of the accident. A jury could reasonably infer from this evidence that the policy was in effect on November 4.

Erie directs us to conflicting evidence, but weighing conflicting evidence is reserved for the jury. After Swanson sent the policy certification to Erie's counsel, Swanson later testified the end date in her certification was a scrivener's error. The certification should have said the policy was in effect from "August 27, 2017 to November 1, 2017". But we do not look to conflicting evidence to determine sufficiency. Erie admits that the Cosmes presented "reed-thin quantitative evidence that a contract was in place at the time of the accident". But just as "reed-thin" evidence is enough to defeat summary judgment, see *Hughley*, 15 N.E.3d at 1004, so too is it enough to withstand a directed verdict. The jury may ultimately agree with Erie that the initial certification was an error, and thus the policy was not in effect at the time of the accident. But that factual dispute is for the jury to decide after hearing all the evidence, not for the trial judge to decide at the close of plaintiffs' case.

The evidence that Erie cancelled the policy after discovering Broyce's suspended license is also conflicting. Erie is correct there is nothing improper with cancelling an auto-insurance policy if a named insured's driver's license is suspended "during the policy period". Ind. Code § 27-7-6-4(b). But the Cosmes' evidence is that Erie's conduct leading up to the cancellation lulled them into believing Erie would not cancel their policy. We hold that a reasonable jury could find that Erie breached the policy and acted in bad faith first when it cancelled the policy and later when it denied the Cosmes' claim.

To begin, when Aguilar, the Churilla employee, was communicating with the Cosmes about the impending cancellation of their policy, Aguilar was Erie's agent. While an insurance agent is the agent of the insured when procuring a policy, *Filip v. Block*, 879 N.E.2d 1076, 1085 (Ind. 2008), once the policy is issued, an agent becomes the agent of the insurer, *Aetna Ins. Co. of the Midwest v. Rodriguez*, 517 N.E.2d 386, 388 (Ind. 1988). When the Cosmes were communicating with Aguilar about the policy cancellation, the policy had been issued, and Aguilar was then acting as Erie's agent. Aguilar also had apparent authority because when Roy called Erie about the imminent cancellation, Erie directed him to Churilla. This manifestation by Erie gave the Cosmes reason to believe that Churilla had authority to bind Erie on the policy-cancellation issues. See *Gallant Ins. v. Isaac*, 751 N.E.2d 672, 675 (Ind. 2001). Thus, Aguilar could bind Erie, and her actions may be imputed to Erie.

With Aguilar's actions imputed to Erie, a reasonable jury could find Erie's bad-faith conduct caused the policy's cancellation. Aguilar's communications with the Cosmes led them to believe Erie would not cancel their policy and deterred them from taking action that would have kept the policy in effect. According to Roy, Aguilar never made clear that he had to sign the exclusion form to avoid cancellation, or that providing license-reinstatement documents would not preserve the policy. Rather than insist that Roy sign the exclusion form, Aguilar sought Broyce's reinstatement papers and confirmed receipt of these papers on October 30. From these communications, Roy believed that he had resolved Erie's threat to cancel the policy, and that the October 28 deadline to prevent cancellation no longer applied—or so a reasonable jury could believe.

It was not until October 31, a day before the policy would cancel, when Aguilar finally informed the Cosmes that signing the exclusion form was the only way to keep the policy in force. Aguilar knew before this date that the reinstatement documents would not prevent cancellation. But she worked with the Cosmes to obtain the reinstatement documents anyway, letting the Cosmes believe they were resolving the cancellation issue.

Unfortunately, Aguilar's last-minute attempt to inform the Cosmes failed, and neither Roy nor Broyce received her messages in time. Thus, unbeknownst to the Cosmes, their policy had already been cancelled when Clark rear-ended them a few days later. After leading the Cosmes to believe the policy issue was resolved, Erie then denied the claim because the policy was no longer in effect. Construing all reasonable inferences in the Cosmes' favor, we hold that a reasonable jury could find that this was an unfounded refusal to pay the claim and a bad-faith breach of contract for which punitive damages may be proper. See *Monroe Guar. Ins.*, 829 N.E.2d at 976.

For these reasons, a reasonable jury could find that the policy was still in effect at the time of the accident, and that Erie's communications in cancelling the policy and its subsequent denial of the Cosmes' insurance claim were a bad-faith breach of contract. Directed verdict for Erie was thus improper.

2

Though the trial court erred in granting judgment on the evidence to Erie, it correctly found insufficient evidence supported the Cosmes' claim against Churilla. Looking only at the evidence supporting their professional-negligence claim, we hold the plaintiffs' claim against Churilla fails because Churilla owed no legal duty to the Cosmes.

Two potential duties an insurance agent can owe to an insured are relevant here: duty to procure and duty to advise. Under the duty to procure, agents owe their clients "a general duty of reasonable care and skill in obtaining insurance and following their clients' instructions." *Ind. Restorative Dentistry, P.C. v. Laven Ins. Agency, Inc.*, 27 N.E.3d 260, 264 (Ind. 2015).

The Cosmes frame their communications with Churilla as obtaining insurance from Erie. But their discussions on the imminent cancellation of the policy did not involve obtaining insurance. And Churilla had no duty to offer the Cosmes alternative insurance. The duty to procure arises from a contract to procure, which requires at a minimum that the insured give the agent enough direction so the agent can obtain an insurance contract. *Id.* at 269. Here, the Cosmes never directed Churilla to procure alternative insurance. Thus, there was no contract to procure, and Churilla owed no duty to the Cosmes.

The Cosmes' claim for breach of duty to advise also fails. An agent may have a duty to advise insureds about coverage. *Id.* at 264. But this duty arises only when a "special relationship" exists. *Ibid.* The nature and length of the relationship determine whether it is "special", and "[a]ll special relationships are long-term". *Id.* at 265. A special relationship depends on four factors: (1) the agent exercises broad discretion to serve the insured's needs; (2) the agent counsels the insured on specialized coverage; (3) the agent holds herself out as a highly skilled insurance expert, and the insured relied on this expertise; and (4) the agent receives compensation for expert advice. *Ibid.* The Cosmes argue a special relationship exists because Churilla advised the Cosmes on the cancellation and advocated with Erie to keep Broyce on the policy. But these facts are irrelevant to finding a special relationship. The Cosmes introduced no evidence to show the relationship was long-term, that Churilla had broad discretion, or that Churilla had any special expertise or obtained specialized coverage.

Lacking evidence on the duty element of their professional-negligence claim, the Cosmes cannot meet the quantitative prong of the directed-verdict standard. Thus, we agree with the trial court that Churilla is entitled to a directed verdict.

*       *       *

For these reasons, we reverse the trial court's directed verdict for Erie, we affirm as to Churilla, and we remand for further proceedings consistent with our opinion.

Rush, C.J., and Massa, Goff, and Molter, JJ., concur.

ATTORNEYS FOR APPELLANTS, CHRISTINE COSME AND ROY
COSME
Angela M. Jones
The Law Office of Angela M. Jones, LLC
St. John, Indiana

Steven J. Sersic
Smith Sersic, LLC
Munster, Indiana

ATTORNEY FOR APPELLEE, DAN CHURILLA D/B/A CHURILLA
INSURANCE
Trevor W. Wells
Reminger Co., L.P.A.
Merrillville, Indiana

ATTORNEY FOR APPELLEE, ERIE INSURANCE EXCHANGE
James P. Strenski
Drewry Simmons Vornehm, LLP
Carmel, Indiana

ATTORNEYS FOR AMICUS CURIAE, DEFENSE TRIAL COUNSEL
OF INDIANA
Lucy R. Dollens
Quarles & Brady, LLP
Indianapolis, Indiana

Crystal G. Rowe
Kightlinger & Gray, LLP
New Albany, Indiana

ATTORNEYS FOR AMICUS CURIAE, INDIANA TRIAL LAWYERS ASSOCIATION

Nicholas C. Deets
Tyler J. Zipes
Hovde Dassow + Deets, LLC
Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE, INDIANAPOLIS BAR ASSOCIATION, APPELLATE PRACTICE SECTION

Paul L. Jefferson
McNeely Law
Indianapolis, Indiana

Bryan H. Babb
Bose McKinney & Evans LLP
Indianapolis, Indiana

Christopher J. Bayh
Barnes & Thornburg LLP
Indianapolis, Indiana

Joel M. Schumm
Indiana University Robert H. McKinney School of Law
Indianapolis, Indiana